EMMA CORCORAN, as Administratrix of the Estate of MARGARET CORCORAN, Deceased, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

1. MUNICIPAL CORPORATIONS — DUTY OF CITY TO KEEP ITS STREETS FREE FROM DANGEROUS DEFECTS — USE OF AUTOMOBILES UPON CITY STREETS.  While a municipal corporation is not an insurer of travelers using its streets and owes no special duty to those who ride in automobiles, it is at all times bound to exercise due care to keep its public and much-used streets safe and free from dangerous defects, and such streets may be as freely used by those who ride in automobiles as by pedestrians or other travelers.

2. NEW YORK (CITY OF) — DANGEROUS PLACE CREATED BY CLOSING · OF STREET, THEREBY FORMING CUL DE SAC — DUTY OF CITY IN GUARDING CUL DE SAC. Where a street in the city of New York has been closed at the top of a high embankment, from which the street was formerly con-tinued by a bridge over railroad tracks and a river, which bridge had been removed and a new bridge erected a short distance therefrom with an approach intersecting the street at another point, whereby the street between that point and the embankment, where the old bridge had been, was converted into a *cul de sac*, terminating at the top of a high bank, barricaded by a fence and a guard rail, which might be a dangerous place in the night time to travelers unacquainted with the locality and who might be misled into thinking that the *cul de sac* might be a continuation of the street leading to the new bridge, such *cul de sac* should be so well lighted as to give fair warning that it is a mere *cul de sac*, or so well guarded as to prevent entrance to the point of danger, even upon the darkest night.

3. SAME — NEGLIGENCE — ACTION FOR DEATH OF PERSON KILLED WHILE RIDING IN AUTOMOBILE WHICH CRASHED THROUGH FENCE AT FOOT OF CUL DE SAC — QUESTION OF FACT. Where a party riding in an automobile, in the night time, through the street of which such *cul de sac* was formerly a part, left the street at the point where it intersected with the *cul de sac* and the approach to the new bridge, instead of continu-ing along the latter to the bridge, and passing through the *cul de sac* crashed through the fence at the top of the embankment and fell to the railroad tracks below, where several of the party were struck by a passing train and killed, and in an action brought against the city of New York to recover for the death of one of those killed in such accident, there is evi-dence that there was nothing at the point of the intersection of the street with the *cul de sac* to indicate that the latter terminated in a dangerous declivity a few hundred feet away, except the electric lights at the point of intersection and at other points along the *cul de sac*, and there is evi-dence that such lights were insufficient to show the guard rail and fence at the end of the *cul de sac*, and also that, a short time previous, another automobile had crashed into the fence under similar circumstances and the accident had been reported at a police station, the question whether the city had provided sufficient light to enable a traveler at night to discern the guard rail and fence, and to be aware of the danger in time to avert accident, is one of fact for a jury; a judgment dismissing the complaint is erroneous, therefore, and must be reversed, since the situation was such as would have warranted the jury in deciding that a traveler, although exer-cising reasonable prudence and foresight, might meet with an accident at such place in the absence of more effective safeguards than those furnished by the defendant.

4. SAME — CONTRIBUTORY NEGLIGENCE — WHEN QUESTION WHETHER AUTOMOBILE WAS OPERATED WITH DUE CARE AND CAUTION ONE OF FACT. Where it is shown that the automobile was going at the rate of eight or ten miles an hour, and that the operator was experienced and careful,

although there is evidence tending to show that the automobile could have been stopped within eighteen or twenty feet and that the fence at the foot of the *cul de sac* could have been seen at a distance of fifteen feet, the question of contributory negligence is also one of fact for the jury, since the plaintiff is entitled to the benefit of the legal principle that a traveler on a city street has the right to assume that all the parts thereof intended for travel are safe, and he is not open to the imputation of negligence if he fails to discern an unknown and concealed danger at the very instant necessary to prevent an impending disaster.

*Corcoran* v. *City of New York*, 114 App. Div. 910, reversed.

(Argued February 26, 1907; decided March 15, 1907.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 26, 1906, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

Shortly after midnight of October 6, 1904, an automobile containing plaintiff's intestate and eight other persons crashed through a fence which extended across the westerly end of Jerome avenue in the city of New York, falling over a sheer declivity to a depth of between twenty and thirty feet just beyond the fence, and landing on the tracks of the New York Central Railroad Company, where the automobile and the party which had occupied it were run down by a passing train, and the plaintiff's intestate was killed.

This action was brought against the city of New York to recover the damages occasioned by that death. The negligence charged in the complaint against the defendant is that the latter failed to properly light and guard the street at the point of this declivity, and these allegations are put in issue by the answer. At the close of the plaintiff's case the learned trial court dismissed the complaint upon the ground that no negligence had been established against the defendant, and the judgment entered upon that decision was affirmed at the Appellate Division, with two of the justices dissenting. Further facts appear in the opinion.

*Dudley R. Horton* and *Charles W. Ridgway* for appellant. The lower end of Jerome avenue, being a dangerous location, by reason of the abrupt fall on to the railroad track,

and the street being so constructed, paved, guttered, curbed and sidewalked, and trolley tracks being laid thereon, thus inviting the traveler to use it, there was a duty imposed upon the city to place danger lights upon the fence, or, at least, to have the spot so lighted that there could be no possibility of a wayfarer mistaking it for an approach to the bridge, brilliantly lighted and in his direct view. (*Chisholm* v. *State of New York*, 141 N. Y. 246 : *McCarthy* v. *City of Syracuse*, 46 N. Y. 194 ; *Godfrey* v. *City of New York*, 104 App. Div. 357; *Ehrgott* v. *Mayor*, 96 N. Y. 264 ; *Clark* v. *Lockport*, 49 Barb. 580 ; *Davenport* v. *Ruckman*, 37 N. Y. 568 ; *Sewall* v. *Cohoes*, 75 N. Y. 45 ; *Gillespie* v. *City of Newburgh*, 54 N. Y. 468 ; *Corcoran* v. *Village of Peekskill*, 108 N. Y. 151 ; *Parks* v. *City of New York*, N. Y. L. J. April 5, 1906.) It was negligence on the part of the defendant, on removing the old McComb dam bridge from the lower end of Jerome avenue, to maintain the street in the condition it was, on October 7, 1904, without placing across Jerome avenue a barrier of sufficient height and strength to prevent an automobile or any other vehicle going through the same, and without lighting it so that it could be seen in ample time to bring a vehicle to a stop before reaching it. (*Snowden* v. *Town of Somerset*, 171 N. Y. 105 ; *Weed* v. *Vil. of Ballston Spa*, 76 N. Y. 329 ; *Pettingill* v. *City of Yonkers*, 148 N. Y. 67 ; *Beltz* v. *City of Yonkers*, 148 N. Y. 67 ; *Harris* v. *Uebelhoer*, 75 N. Y. 175 ; *Healy* v. *Mayor*, etc., 3 Hun, 708 ; *Rector* v. *Pierce*, 3 N. Y. Supp. 416.) It was error for the court to dismiss the complaint as there were questions involved which should have been submitted to the jury. (*Snowden* v. *Town of Somerset*, 171 N. Y. 104 ; *Parks* v. *City of New York*, N. Y. L. J. April 5, 1906 ; *Corcoran* v. *Village of Peekskill*, 108 N. Y. 151 ; *Davenport* v. *Ruckman*, 37 N. Y. 568 ; *Mosey* v. *City of Troy*, 61 Barb. 580 ; *Sewell* v. *City of Cohoes*, 75 N. Y. 45 ; *Conrad* v. *Trustees of Ithaca*, 16 N. Y. 158 ; *Weed* v. *Trustees of Brockport*, 16 N. Y. 161 ; *Todd* v. *City of Troy*, 61 N. Y. 506 ; *Gillespie* v. *City of Newburgh*, 54 N. Y. 468.)

*William B. Ellison, Corporation Counsel (Theodore Connoly* and *Royal E. T. Riggs* of counsel), for respondent. Jerome avenue in the vicinity of the place of the accident was reasonably well lighted for purposes of ordinary travel, and no negligence in that respect can be imputed to the defendant. (*People ex rel. Williams* v. *Kingman,* 24 N. Y. 559; *Saunders* v. *Townsend,* 26 Hun, 308; *Vandemark* v. *Porter,* 40 Hun, 397; *Lyon* v. *Cambridge,* 136 Mass. 419; *Macomber* v. *Taunton,* 100 Mass. 255; *Freeport* v. *Isbell,* 83 Ill. 440; *Gaskins* v. *Atlanta,* 73 Ga. 746; Whart. on Neg. § 973; 2 Dillon on Mun. Corp. § 1010; *Butler* v. *Bangor,* 67 Me. 385; *Randall* v. *E. R. R. Co.,* 106 Mass. 276; *Noble* v. *Richmond,* 31 Gratt. 271.) The city was bound only to keep its streets reasonably safe and reasonably well lighted. A municipality is not an absolute insurer of the safety of its streets, as it is only required to use reasonable care in keeping them safe. (*Hubbell* v. *City of Yonkers,* 104 N. Y. 434; *Hunt* v. *Mayor, etc.,* 109 N. Y. 134; *Jenny* v. *City of Brooklyn,* 120 N. Y. 164; *Lane* v. *Town of Hancock,* 142 N. Y. 510; *Beltz* v. *City of Yonkers,* 148 N. Y. 67; *Hamilton* v. *City of Buffalo,* 173 N. Y. 72; *King* v. *Village of Fort Ann,* 180 N. Y. 496.; *City of Chicago* v. *Apel,* 50 Ill. App. 132; *City of Chicago* v. *McDonald,* 57 Ill. App. 250; Dillon on Mun. Corp. § 1019.) The accident was one which could not have been anticipated or foreseen in the exercise of reasonable prudence and care. (*Hubbell* v. *City of Yonkers,* 104 N. Y. 434; *Monk* v. *Town of New Utrecht,* 104 N. Y. 552; *Glasier* v. *Town of Hebron,* 131 N. Y. 447; *Lane* v. *Town of Hancock,* 142 N. Y. 510.)

WERNER, J. Jerome avenue is one of the public streets in the city of New York. Its general direction is north and south, but as it approaches the Harlem river from the north it turns westerly and ends abruptly at the New York Central Railroad Company's tracks which, at this point, border on the Harlem river at a level of from twenty to thirty feet below the surface of the adjacent streets. Prior to 1895 the old McComb's dam

bridge formed a continuation of Jerome avenue and connected it with the island of Manhattan on the south side of the Harlem. At some time in that year the old bridge was removed, leaving Jerome avenue to terminate abruptly as above described, and some six or seven years before the trial of this action the defendant had erected across this abrupt end of Jerome avenue a picket fence about six feet high, which extended across the whole width of the street. This fence was close to the end of the declivity, and converted this part of the street into a *cul de sac.* Extending across a part of the street, at a point about four feet easterly from the fence in question, was what is known as a guard rail, constructed of upright chestnut posts, six inches in diameter, connected at the top and about midway between the ground with two by four rails. After the old bridge had been taken away a new bridge was built across the Harlem river, with its easterly approach commencing near the intersection of Jerome avenue and One Hundred and Sixty-second street, at a point about fifteen hundred feet easterly from the fence at the end of the *cul de sac.* This new approach forms a continuation of Jerome avenue, which now converges southerly on a curve and crosses the Harlem to the south of the *cul de sac*, while the *cul de sac* continues along the old lines of Jerome avenue, which are slightly to the right of and almost parallel with the new approach. The two branches of Jerome avenue thus described form what may be termed an oval which extends to the Harlem river. At this point Jerome avenue is intersected on the northerly side by Ogden avenue and Sedgwick avenue. Ogden avenue runs generally north and south, and enters Jerome avenue about three hundred and fifty feet from the picket fence. Its course is changed on the opposite side of Jerome avenue, where it connects with the approach to the new bridge, forming what is called the Ogden avenue approach. The direction of Sedgwick avenue is approximately east and west, and it enters Jerome avenue still nearer the fence, its curb line on the westerly or lower side being two hundred and forty feet therefrom and practically oppo-

site the Ogden avenue approach. From the intersection of these two avenues with Jerome avenue the latter continues, as already stated, along the old lines to the abrupt ending at the guard rail and picket fence. This was the physical situation at the time and place of the accident.

On the night in question the plaintiff's intestate with ten others had been at a resort on One Hundred and Tenth street. They left there in two automobiles at between nine and ten o'clock in the evening and went to a roadhouse called Woodward's, at One Hundred and Seventy-seventh street and Jerome avenue. Two of the party left the latter place in one of the automobiles, and the other nine, including plaintiff's intestate, continued there, dancing and singing until about midnight when they entered the remaining automobile. Seven of them got into the tonneau of the vehicle, and the front two seats were taken by the plaintiff's intestate and one Noyes who operated the machine. The party proceeded along Jerome avenue towards the city, and when they had reached the intersection of that avenue with the new bridge approach near One Hundred and Sixty-second street they held to the right or north, following the old lines of Jerome avenue into the *cul de sac*, instead of keeping to the left and going along the new approach to and across the bridge. This explains how they came into collision with the guard rail and picket fence with the result above stated.

The foregoing facts were supplemented by evidence from which a jury might have found that to a traveler in the darkness of the night, who was unfamiliar with that locality, there was nothing to indicate that the street ended at a dangerous declivity not more than two hundred and fifty feet beyond the intersection of Jerome avenue with Ogden and Sedgwick avenues, unless there was sufficient artificial light in the vicinity to plainly disclose the situation. It is obvious, therefore, that the crucial question in the case was whether this dangerous place was sufficiently lighted. As bearing upon that question it was shown that there was an electric light (since removed) on the northerly side of Jerome avenue one hundred and

seventeen feet from the fence and one hundred and twenty-six feet from the place where the automobile collided with the fence. There were small maple trees on each side of this light, the branches and foliage of which somewhat obscured it. On the left or southerly side of Jerome avenue, at the easterly corner of the Ogden avenue approach and a distance of two hundred and eighty-two feet from the fence, there was another electric light, while there were others further to the south. The new bridge which, viewed from the cul de sac, extended diagonally across the Harlem river, was brilliantly lighted, and the lights on the draw span were so directly in front of the traveler coming down Jerome avenue that they might easily have been mistaken for lights that appeared to be placed along a direct continuation of Jerome avenue to the west. The possibility of such a mistake was increased by the fact that the cul de sac was paved, guttered and curbed. It was laid with two lines of railroad tracks close up to the fence, and the sidewalks extended on either side to the same point. The guard rail and the picket fence were so weather beaten and dark in color that they were less visible in the night than painted structures would have been. There was evidence tending to show that there was plenty of light on the Ogden avenue approach, but that it cast a very dim reflection toward the fence two hundred and eighty-two feet distant, and that in going from the illuminated zone of the Ogden avenue approach into the more dimly lighted cul de sac, the traveler's ability to see surrounding objects plainly was considerably decreased. Something like a month prior to the date of the accident another person or party coming down Jerome avenue in an automobile had crashed into this same fence under similar circumstances, and had reported the accident at a police station. Horses had been frequently heard in the night time to stop suddenly in front of the fence, and there was other evidence from which the jury could have found that it was impossible to see the fence in the night time until very close to it.

Upon such evidence, with all the inferences fairly deduci-

ble therefrom, it seems to us impossible to escape the conclusion that the case presented questions of fact for decision by the jury. Jerome avenue was one of the public streets of the city of New York. It was, therefore, the duty of the municipality to see that it was at all times kept in a reasonably safe condition for travel thereon. Although it owed no special duty to those who ride in automobiles, and was not an insurer of the travelers using that street, it was at all times bound to exercise due care to keep the highway reasonably safe and free from dangerous defects. (*Hunt* v. *Mayor, etc., of N. Y.,* 109 N. Y. 134; *Hubbell* v. *City of Yonkers,* 104 id. 434.) It cannot be said that the city was under any duty to safeguard this dangerous place with a more substantial barricade than the fence and guard rail, for they were doubtless sufficient for ordinary emergencies such as would be likely to arise in the day time in the use of the street by pedestrians or drivers of horses. But the streets of a city may be as freely used by those who ride in automobiles as by pedestrians or travelers, and if this *cul de sac* was likely to be a dangerous place in the night time to any class of wayfarers who might be misled into thinking that it would be a continuation of the highway, it should have been so well lighted as to give fair warning that it was merely a *cul de sac,* or so well guarded as to prevent entrance to the point of danger, for "a public highway may be used in the darkest night; a night so dark that the keenest and clearest vision may not be able to detect obstructions and defects." (*Harris* v. *Uebelhoer,* 75 N. Y. 175.) We think that the question whether the city had provided sufficient light to enable a traveler at night to discern the guard rail and fence, and to be aware of the danger in time to avert accident, was one of fact. (*Snowden* v. *Town of Somerset,* 171 N. Y. 99.) The situation disclosed by the record was such as would have warranted the jury in deciding that a traveler, although exercising reasonable prudence and foresight, might meet with an accident at this place in the absence of more effective safeguards than those furnished by the defendant. This conclusion is no less admissible in respect to

automobiles than of any other kind of vehicle rightfully used upon the public streets. As bearing upon that question the jury would have had the right to consider that at least one similar accident had previously happened at this place to the knowledge of some of the city authorities, and that all the physical conditions surrounding the place of the accident were such as to lull the wayfarer into a feeling of security instead of awakening in him a sense of danger.

We are also of the opinion that the question of contributory negligence was one of fact for the consideration of the jury. The automobile was going at the rate of eight to ten miles an hour, and Noyes was shown to have been an experienced and careful operator. Although the testimony tends to show that this automobile, weighing three thousand pounds, and going at the rate of from eight to ten miles an hour, could have been stopped in from eighteen to twenty feet, it is still a question of fact whether under the conditions which existed the guard rail and fence were visible from a sufficient distance to make such a stop possible. It is true that one of the occupants of the tonneau testified that the fence could be distinguished at a distance of fifteen feet, but that is by no means conclusive, for the plaintiff was entitled to the benefit of the legal principle that a traveler on a city street has the right to assume that all the parts thereof intended for travel are safe, and he is not open to the imputation of negligence if he fails to discern an unknown and concealed danger at the very instant necessary to prevent an impending disaster. (*Brusso* v. *City of Buffalo*, 90 N. Y. 679 ; *McGuire* v. *Spence*, 91 id. 303 ; *Weed* v. *Vil. of Ballston Spa.*, 76 id. 329 ; *Chisholm* v. *State of New York*, 141 id. 246.)

The judgment should be reversed and a new trial granted, with costs to abide the event.

EDWARD T. BARTLETT, WILLARD BARTLETT and HISCOCK, JJ., concur; CULLEN, Ch. J., HAIGHT and VANN, JJ., dissent.

Judgment reversed, etc.