## MAYOR AND CITY COUNCIL OF BALTIMORE *v.* HEDWIG THOMPSON

[No. 64, October Term, 1936.]

*Decided January 19th, 1937.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*R. E. Lee Marshall, City Solicitor,* and *Paul F. Due, Deputy City Solicitor,* with whom was *James J. Doherty, Assistant City Solicitor,* on the brief, for the appellant.

*James M. Roche,* with whom were *Harry I. Kaplan* and *Malcolm J. Coan* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Eager Street, running east and west, in Baltimore City, is carried over the tracks of the Pennsylvania Railroad Company by a steel and concrete bridge supported in part by three iron girders incased in concrete. A few feet west of the bridge Eager Street intersects the Fallsway, a north and south street running parallel to the railway tracks. A short distance east of the bridge it intersects Buren Street, and three or four blocks east of the bridge it intersects Greenmount Avenue. One of the three girders is located on either side of the bridge at the edge of that part of the street used for vehicular traffic, and the other in the center of the street, dividing it on the bridge into two driveways, one for east, the other for west bound traffic. The center girder is about seventy-six feet long, about five feet high, about twenty inches wide, and the concrete incasing it is grayish black in color. Each driveway is about eighteen feet wide, and paved with sheet asphalt. At the east end of the girders on each side of the bridge are posts supporting lamps containing electric bulbs of 250-candle power each, between fourteen and fifteen feet above the street level. There is also a 400-candle power street light at the southeast corner of the intersection of Eager Street and the Fallsway, and another at the northwest corner of that intersection. At the southeast corner of Buren and Eager Streets, about eighty feet east of the bridge, is a 50-candle power street light.

At about 8 or 8:30 o'clock in the evening of January 21st, 1935, Harry C. Thompson, accompanied by Hedwig Thompson, his wife, the appellee, was driving his automobile west on Eager Street, and approaching the bridge from the direction of Greenmount Avenue. The night was foggy, the visibility was poor, and as he attempted to cross the bridge his automobile collided with the east end of the center girder. As a result of the collision, he was knocked unconscious and Mrs. Thompson suffered severe and painful injuries. Subsequently Mrs. Thompson brought this action against the Mayor and City Coun-

cil of Baltimore City and the Pennsylvania Railroad Company, to recover compensation for those injuries, on the theory that the defendants were negligent in failing to take reasonable precaution to warn the traveling public of the presence of the center girder under the conditions existing at the time of the accident.

The case was tried before the court and a jury, and at the close of the plaintiff's case the court granted a prayer for a directed verdict in favor of the railroad company, and the plaintiff thereupon took a judgment of *non pros.* as to it. The case then proceeded and, at the close of the whole case, the jury returned a verdict for the plaintiff. From the judgment on that verdict, this appeal was taken.

Although not so numbered, there are in the record ten exceptions, of which eight relate to rulings on questions of evidence, and two to the court's rulings on the prayers. The exceptions to the evidence were not argued in this court and may be disregarded. Court of Appeals Rules No. 39, sec. 4.

The appellant offered six prayers, marked, A, B, C, D, E, and F, which in one form or another were demurrers to the evidence. Its A and F prayers present what is the real question in the case, whether there is in it any evidence legally sufficient to show that the appellant was guilty of primary negligence in failing to take adequate measures to warn the traveling public of the location of the center girder under the conditions existing at the time of the accident.

In addition to the facts stated, which are not disputed, there was in the case evidence tending to show that at the time of the accident the weather was foggy, cold, damp, and chilly, but not freezing nor raining, and that the visibility because of the fog was very poor at and near the bridge. Harry C. Thompson, testifying for the plaintiff, said that there was no light on the girder itself and that he saw no "marking" on it, that Eager Street slopes slightly downward from Greenmount Avenue to the bridge, that he was not familiar with Eager Street,

and in fact he "thought he was on Chase Street," over which he had driven a number of times, that there was no center girder on Chase Street, that in driving the car, previous to the accident, he had on his dimmers. He did not have his bright lights on because in driving on a foggy night he could see better with them than with his bright lights, that he did not know there was a bridge there. He further said his "headlights on the night of the accident, going ten miles an hour, did not show over ten or fifteen feet in front of his car. He doesn't believe he could not see a person crossing the street fifteen feet in front of him on the night in question at the place of the accident."

He then gave this testimony: "What were the facts that night? Were your headlights sufficient to enable you to see fifteen feet in front of you before you got to that abutment? (The Witness) Yes, sir. (The Court) Well, why didn't you see it then? (The Witness) On account of the fact that the abutment was the same color as the general atmospheric conditions on that night, so that you couldn't discern that you were approaching it or approaching any obstacle until you were immediately upon it. There was a dense fog that night. Almost instantaneously, or instantaneously, with his calling out to Mrs. Thompson, 'look out,' he hit the abutment. Mrs. Thompson said nothing to him about the abutment. He was right on top of it at that time. When he said 'look out' he had seen it. He supposed he was about a foot or two away from it when he said 'look out.' The witness had proceeded west on Eager Street from Broadway to Greenmount Avenue, and he had difficulty in seeing as he drove along. As he came west on Eager Street he was driving a little to the right of the center of the street. There were no markings in the center of the street, but he believed he was driving close to the middle of the street. * * * When he started down the slight incline on Eager Street west of Greenmount Avenue, he saw the boulevard lights on the Fallsway as well as on Eager Street. He knew it was about three or four blocks from Greenmount Avenue to the

Fallsway. When he saw the lights, he thought he was about three blocks away. It was still foggy but he saw the lights. The fog got heavier as he approached them. "Q. How fast were you going when you first saw those lights as you started down that incline, as you call it? A. Approximately ten miles an hour. Q. As the fog got heavier, as you started toward that string of lights, did you slow up any more than you had been? * * * I think I proceeded about the same speed. As the fog got heavier and heavier he could still see light. He knew that he was a little to the right of the center of Eager Street while the left wheel was approximately at the center of the road. He was in the same position when he crossed Buren Street. When he reached Buren Street that was the first time he did not see the lights. He did not slow down any more. 'Q. In other words, you maintained the same speed, although the fog got heavier and the lights disappeared, you could not see the lights, I will put it that way? A. I could see that there were lights on the side of the street.' " He also said that he could see the red tail light of cars parked along the side of the street, and that he knew that the two lights at the end of the bridge were there.

Mrs. Thompson said that, at the time of the collision, the headlights on the automobile were burning, that there were no markings, no black and white stripes on the end of the girder, that if there "was a contrast" she "imagined" when you "got on top of it you could have seen that there was something there to mark it," that they were going very slowly, that she could see ten or fifteen feet if there was an object or a light, that she was looking ahead and to the side trying to see where they were going, but did not see the abutment until they struck it, that "it was all the same color, all gray, and all the same color, the atmosphere and everything else was the same color." It also appeared that the bridge was built by the Pennsylvania Railroad Company under the authority of certain ordinances of the Mayor and City Council of Baltimore, and it was also suggested that it was obliged

to maintain it and keep it in good order. It was also shown without contradiction that the girder was necessary to support the bridge. From these facts, it is apparent that while the girder was not a nuisance and was a necessary part of the bridge, nevertheless it was an obstruction to the free flow of traffic along Eager Street, which, under the weather conditions existing at the time of the accident, might well be dangerous to automobile traffic over the bridge, that other than the lights on either side of the street the municipality had provided no light, marking, or other device to aid travelers on the highway to locate it under the weather conditions existing at that point at the time of the accident. So that the question is, Did the failure of the appellant to furnish such a warning constitute evidence of primary negligence?

It needs no authority to support the proposition that the municipality is under the duty of exercising reasonable care to keep its public highways safe for public travel, and it is equally well settled that it is not an insurer of the safety of persons in the lawful use of such highways (*Elliott on Roads and Streets*, sec. 793), but is only liable for a failure to use reasonable care to so maintain them that travelers thereon in the exercise of reasonable care at night or in the day time may not be subjected to any dangers arising from defects in the construction, upkeep, or maintenance of such highways under reasonably foreseeable conditions of weather or traffic. *Id.;* 29 *C. J.* 680. It may therefore be liable for injuries caused by an obstruction in a public highway of which it had sufficient notice, even though the obstruction is authorized by proper municipal and legislative authority, where it is reasonably foreseeable that it will endanger persons using the highway while in the exercise of reasonable care, unless it takes the precaution of warning such persons of the danger by some reasonably adequate means. *Corcoran v. City of New York,* 188 N. Y. 131, 80 N. E. 660; *McKim v. City of Philadelphia,* 217 Pa. 243, 66 A. 340; *Elliott on Roads and Streets,* sec. 792.

Such a liability does not arise from any failure of a

general duty to light the highways, but from a failure to exercise reasonable care to guard the traveling public against some special condition, of which the municipality had sufficient notice, which an ordinarily prudent person might reasonably anticipate would endanger travelers on the highway while in the exercise of reasonable care. 29 *C. J.* 688. The basis of that liability is the duty resting upon the municipality of keeping the highways safe for travel over them. That duty is not discharged if the highways are permitted to be or remain in such a condition that persons in the lawful use of them may be imperiled by unknown dangers which they could not by the exercise of reasonable and ordinary care anticipate or avoid. The following cases illustrate the application of those principles:

In *Baltimore City v. Beck,* 96 Md. 183, 53 A. 976, 978, the plaintiff, while driving along Fulton Street in Baltimore, drove into a pile of bricks lying in the roadway and was injured. There was no light burning to show the obstruction. In considering the duty of the municipality, the court in that case said:

"There can be no question, then, that, as the municipal authorities of Baltimore had the power and authority to regulate and to remove obstructions from its streets, and to cause the streets to be lighted at the expense of the city, it was its plain duty to have kept the avenue lighted, and in a safe condition for public travel, on the night of the accident in question.

"The law is well settled that, if it negligently fails so to do, and persons acting without negligence on their part are injured while passing along its highways, the city is liable in damages for the injuries caused by the neglect, and the person so injured can recover against the municipality therefor. *Mayor and City Council of Baltimore v. Marriott,* 9 Md. 160; *Mayor and City Council of Baltimore v. Pendleton,* 15 Md. 12."

In *Corcoran v. City of New York,* 188 N. Y. 131, 80 N. E. 660, the plaintiff's intestate was riding at night in an automobile over Jerome Avenue, which abruptly ter-

minated at the edge of a sheer declivity. At the end of the
street there were a picket fence and a guard rail, but no
light sufficient to clearly disclose the situation. The negli-
gence charged was a failure to properly light and guard
the street at the point of the declivity. In dealing with
that question, the court said: "But the streets of a city
may be as freely used by those who ride in automobiles
as by pedestrians or travelers, and, if this cul-de-sac was
likely to be a dangerous place in the night time to any
class of wayfarers who might be misled into thinking that
it would be a continuation of the highway, it should have
been so well lighted as to give fair warning that it was
merely a cul-de-sac, or so well guarded as to prevent
entrance to the point of danger. * * * We think that the
question whether the city had provided sufficient light
to enable a traveler at night to discern the guard rail and
fence, and to be aware of the danger in time to avert
accident, was one of fact." The same court, without decid-
ing whether that case should be followed, distinguished
it in *Gaines v. City of New York*, 215 N. Y 533, 109 N. E.
594, on the ground that, if the duty stressed in the former
case existed, its breach in the *Gaines* case was not the
proximate cause of the injury.

In *Barrett v. Southern Pacific Co.*, 207 Cal. 154, 277
P. 481, 484, a railroad was carried over a public high-
way by a bridge supported in part by a stone pier located
in the center of the highway. The plaintiff, driving an
automobile over the highway in a dense fog, collided with
the pier and was injured. Government records estab-
lished the fact that heavy fogs prevailed in that section
at the time of the accident, and it also appeared that the
pier was not lighted. Dealing with the question of de-
fendant's duty, it was said: "This climatic or atmospheric
condition would seem to have required a color scheme or
painting on the pier different from the grayish color of
the fog. This was not done, at least before this accident.
Then, too, the installation of red lights or other danger
signals on or near the pier as a warning to travelers along
the highway would seem to have been required in the

exercise of ordinary care. In the absence of these precautions we think it was a question of fact for the jury to determine whether the maintenance of the pier in its condition on the night of the accident was negligence on the part of the defendant."

In *Riley v. City of Ronceverte*, 108 W. Va. 222, 151 S. E. 174, the plaintiff was injured as the result of a collision between an automobile in which she was a passenger and a traffic guide at a street intersection The accident was at night. The traffic sign was a hot water boiler filled with cement and so planted that it projected about thirty-four inches above the bed of the street. It was not painted, or lighted, but the city maintained a light at the intersection a few feet from it, and there were other lights nearby, all of which were lighted. The guide had been in that position for about four years. Upon those facts it was held that whether the city was negligent was a question of fact for the jury.

In *McKim v. City of Philadelphia*, 217 Pa. 243, 66 A. 340, a street railway having authority planted a trolley pole in the middle of a city street. There was no light on the pole. The plaintiff's husband, driving a one horse milk wagon along the street, collided with the pole and suffered injuries which caused his death. In holding that the plaintiff had a cause of action, the court said: "Care, under the circumstances, therefore, required the company, and on its default, the city, to give notice of the presence of the pole to those who might be using the street at night. It was a question for the company, subject to the approval of the city, to determine what was necessary for this purpose. The only obligation resting upon either of them was that they took reasonable precaution to accomplish the purpose intended. This might have been done by a light on the pole itself, or by lights in the immediate vicinity of the pole, or in other ways that could be suggested." The court there, as in *Meese v. Goodman*, 167 Md. 658, 669, 176 A. 621, held that the obstruction having been authorized by statute was not a nuisance.

In *Baltimore v. State, use of Cirtout*, 146 Md. 440, 126 A. 130, the plaintiff was a passenger on a motorcycle operated by a friend. At that time McHenry Street was paved for a short distance beyond Bentalou Street in Baltimore City, from that point the bed of the street was rough and uneven for a distance of about twenty-five feet, where it terminated in an abrupt declivity. The operator of the motorcycle driving it over McHenry Street across Bentalou Street discovered the declivity too late to stop, went over it, and the plaintiff was injured. In sustaining the plaintiff's right to recover, the court there said: "Applying the law as stated to the facts above mentioned, it cannot, we think, be properly held that there was no evidence tending to show negligence on the part of the defendant, the Mayor and City Council of Baltimore, in permitting the conditions complained of to exist without protection to those traveling on McHenry Street either by the erection of a railing, fence, or other barrier, or by proper signals or warnings of danger."

In *Gaines v. City of New York, supra,* it was held, in dealing with the collision of an automobile therewith, that the failure of the municipality to place a light on a steel truss dividing the roadway of a bridge over a railway cut was not the proximate cause of the accident, because, under the conditions, it could not be said without guessing that such a light would have prevented the accident.

In *Charles v. Baltimore*, 138 Md. 523, 524, 114 A. 565, 567, the driver of an automobile collided with a concrete division wall separating the driveway over a bridge on Poplar Grove Avenue into two ways. The bridge and the wall were ordinarily lighted, but at that time the lights were out. The court there by implication recognized a duty imposed upon the municipality of lighting the bridge. It said: "It is well settled that it is the duty of a municipality to keep its public streets and highways in a safe and proper condition for public travel, and if the municipality fails in this duty, and a person is injured as a result thereof, without negligence on his part, the municipality is responsible for the same in damages.

*Biggs v. Baltimore,* 129 Md. 686, 99 A. 860; *Baltimore v. Bassett,* 132 Md. 427, 104 A. 39. It cannot be said in this case that the short circuit of the electric current upon the night in question, which resulted from the unusual severe winter weather, was a latent defect, and, since each of these prayers was based upon the supposed existence of such latent defect, the action of the trial court in refusing them was entirely proper."

Cases announcing a different policy are *Lorentz v. Public Service R. Co.,* 103 N. J. Law, 104, 134 A. 818, 820, 49 A. L. R. 989, where it appeared that the plaintiff was injured while riding in an automobile driven by her father, which collided with a column of an elevated structure maintained by the defendant on a public highway, which was unlighted, dirty, and dingy, and the court said: "The complaint counts, however, on the failure to light the columns so that they can more readily be seen at night, and the failure to clean them when they became dirty and dingy. But both these claims imply a duty; and we find no such duty laid down in the statute or ordinance; and without some such requirement in one or the other we are unable to say that any such duty existed. The right to erect and maintain the structure was conferred without any such qualification, and it seems reasonable to say that where neither the statute nor ordinance mentions the matter it must be assumed that the ordinary public lighting of the street was considered sufficient in the premises."

*O'Rourke v. Washington City,* 304 Pa. 78, 155 A. 100, 78 A. L. R. 811, where it was held that the municipality was not negligent in failing to give warning by a light or otherwise of an embankment which ran across the end of a street, where it was not shown that the location of the barrier was not readily apparent. But in *Louisville & N. R. Co. v. Loesch,* 215 Ky. 452, 284 S. W. 1097, 47 A. L. R. 347, the duty of the owner of a toll bridge to light it at night sufficiently to protect travelers using it is recognized, and a number of cases dealing with that question were collected in a note to that case.

In *Pugh v. Catlettsburg*, 214 Ky. 312, 283 S. W. 89, 46 A. L. R. 939, the plaintiff's automobile collided with an iron pier placed in a public highway and supporting the overhead tracks of a railway company. At the time of the collision the driver of the automobile was so blinded by the glare of the headlights of a car approaching him that he could not see over five feet in front of him. The pier itself was unlighted, but there were arc lights at the intersection, near enough to furnish "reasonable sufficient light" to permit the viaduct and the piers to be seen by persons using the street at that point. It was held that under those circumstances a verdict was properly directed for the defendant.

A contrary result was reached in *Boyd v. Kansas City*, 291 Mo. 622, 237 S. W. 1001. There the plaintiff, a passenger, was injured when the automobile in which he was riding collided with an unlighted girder running along the center of a bridge. See, also, *Williams v. Washington*, 142 Ga. 281, 82 S. E. 656 L. R. A. 1915A, 325, Ann. Cas. 1916B, 196; *White v. City of New Bern*, 146 N. C. 447, 59 S. E. 992, 13 L. R. A. (N. S.) 1166, 125 Am. St. Rep. 476.

In *Becker v. Illinois Central R. Co.* (La. App.) 147 So. 378, cited by the appellant, plaintiff's automobile collided with a pier located on the highway and supporting an overhead railroad structure. It appeared that there was a red light on the pier itself, and the case turned on the negligence of the driver of the automobile.

In *Burd v. City of Atlanta*, 52 Ga. App. 681, 184 S. E. 412, the failure to light a "center support" of a railroad bridge, which support was in the center of a highway and dark or dull in color, or to give any other warning of its presence, was relied upon as evidence of negligence. The court affirmed a finding of contributory negligence, but in a dictum intimated that the city was under no duty to light the obstruction, because it was a permanent improvement and for the benefit of the public. A like result on similar facts was reached in *Beal v. Erie R. Co.*, 51 Ohio App. 397, 1 N. E. (2nd) 328, by the intermediate Appellate Court of Ohio.

In *Shannon v. City of Council Bluffs,* 194 Iowa, 1294, 190 N. W. 951, 953, where the action was for compensation for injuries sustained as the result of a collision between an automobile in which plaintiff's decedent was riding and the center truss of a double bridge which was in the center of the street, it was held that the city was not negligent in failing to paint the center truss white, where it appeared that the bridge was sufficiently lighted to have disclosed the location of the truss to one driving in a lawful manner and at a lawful speed.

These and other cases dealing with the question do not permit the formulation of any general rule, applicable to all cases, as to the duty of a municipality or other agency in control of public highways to protect travelers thereon from danger incident to obstruction within the lines of the highway, except that where the obstruction is of such a character as to seriously imperil the safety of travelers on the highway, there is a duty upon the municipality or other agency to exercise reasonable care to warn by adequate means the traveling public, while using the highway under reasonably foreseeable conditions of weather or traffic, of the location of the obstruction, or to otherwise guard them against injury therefrom. 13 R. C. L. 354-356; 29 C. J. 688.

Turning again to the facts of this case, it appears without contradiction that the bridge has existed in its present condition for about twenty years. It does not appear that any other collisions between vehicles passing over it, and either the center or the side girders, have ever occurred, nor is it affirmatively shown that fogs such as that described by the witnesses for the plaintiff are customary or usual at that point, but it does appear that the lights provided by the city and burning at the time of the accident would sufficiently light the bridge to permit travelers exercising reasonable care to discover the location of the center girder under ordinary weather conditions, in time to avoid colliding with it. It may be assumed too that had there been a light on the end of the girder itself the driver of the automobile could have seen it

in time to avoid a collision, because he saw the lights on the side girders at the east end of the bridge, and saw the red tail lights of cars parked along the side of the street. It seems obvious, too, that a wall of concrete, twenty inches wide and five feet high, in the center of an otherwise open and unobstructed highway, is an obstruction, which under certain conditions may, because its color blends with that of the street surface, constitute such a threat to the safety of the traveling public as to place the municipality under a duty to provide means of warning travelers on the highway of its location. So the question comes at last to this, Was the city under any legal duty to anticipate the occurrence of such weather conditions as existed at the time of the accident at that place? That such fogs do occur in the City of Baltimore and the adjacent territory with sufficient frequency to justify a reasonable expectation that they will from time to time recur is a matter of common knowledge; therefore the appellant should have anticipated their occurrence and have placed a warning light or other device, which under fog conditions would have permitted a traveler approaching the bridge to have discovered the location of the center girder in time to avoid colliding with it.

Stress was laid by the appellant upon the proposition that the city had no sufficient notice of the danger presented by the unlighted girder. But the city approved the plans for the construction of the bridge and was charged with the knowledge of weather conditions common to all residents of the city, nor did the fact, if it was a fact, that accidents had not occurred in the past conclusively prove that the obstruction did not constitute a danger to the traveling public.

Nor does the evidence require any conclusive inference of contributory negligence. There was evidence that both the plaintiff and her husband were taking every precaution to discover objects in front of them, that the automobile was "just crawling," that the husband "couldn't slow down much more." Reasonable care did not require them to stop altogether, and there is no evidence that

they could have avoided the fog by any other route. *Thompson v. City of Bellingham*, 112 Wash. 583, 192 P. 952, 19 A. L. R. 864.

Appellant also objects to the action of the trial court in directing a verdict for the Pennsylvania Railroad Company. The reason for that ruling does not appear, but since the appellee submitted voluntarily to a judgment of *non pros.* as to that defendant before any verdict as to it was returned, it is not apparent how the propriety of that ruling can be considered on this appeal. So far as we know, the rule that a plaintiff may sue any one or all of several joint *tort-feasors* at his election is still the law of this state. And, after the judgment of *non pros.* except for the payment of costs, the appellee has the same right to sue the railroad company now as she had before this action.

The rulings of the court as to the jury prayers were not argued in this court and will be taken as abandoned. It follows that appellant's demurrer prayers were properly refused and the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*