## MAYOR AND CITY COUNCIL OF BALTIMORE *v.* LOCKE

[No. 187, September Term, 1957.]

*Decided March 25, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, PRESCOTT and HORNEY, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*Blanche G. Wahl, Assistant City Solicitor of Baltimore,* with whom were *Thomas N. Biddison, City Solicitor, Hugo A. Ricciuti, Deputy City Solicitor,* and *F. Clifford Hane, Assistant City Solicitor,* on the brief, for the appellant.

Submitted on brief by *S. Herbert Harris, Harry Harris* and *Melvin J. Sykes* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The plaintiff below, appellee here, recovered judgments of $39,000 against the City and one Matthews for personal injuries sustained in an automobile collision. The City appeals, challenging the sufficiency of the evidence of its primary negligence, the refusal of its prayer on the point of contributory negligence, and the admission of certain evidence as to its actions subsequent to the accident.

The collision occurred at 6:15 A. M., according to Locke, or 6:20 A. M., according to Matthews, on the morning of November 12, 1955. The time was either 26 or 31 minutes before sunrise, the weather dry but cloudy. There was some conflict in the evidence as to visibility, but most of the cars on the highway had their headlights on. The street lights had been turned off at 6:15, before the accident occurred. The speed limit was 25 miles per hour. Locke was driving east on Holabird Avenue, a dual highway 40 feet wide with 2 unmarked lanes for traffic in each direction and a double yellow line painted down the center. Matthews was driving west with his headlights on and pulled to his left around a barricade in the westbound lanes marking a hole in the street. He collided head-on with Locke's car at about the center of the eastbound lanes. Matthews testified he did not see the barricade until he was a car length from it, although he admitted that his headlights had a range of 120 feet. He did not see any light on the barricade. He testified he was driving at 25 miles per hour and could have stopped in a car length, but he became frightened and swerved to his left without attempting to stop. His car left no skid marks. The point of collision was 52 or 57 feet west of the barricade. He saw the headlights of eastbound cars in the distance, but did not see Locke's car until the moment of impact. He testified that Locke did not have his headlights on. He testified that he was on his way to work, but had never driven his car to work before.

Locke testified that he had his headlights on. He saw the barricade, which was illuminated by the headlights of Matthews' car. In fact, he testified that he knew it was there and had himself pulled around it when returning from work the day before, although there was other testimony that the barricade had not been in place at that time. When he was 80 feet from the barricade, he saw Matthews' car pull out around it. He kept straight ahead, but applied his brakes, leaving skid marks 28 feet in length. After the collision, both cars were in about the center of the eastbound lanes, the rear wheels of Locke's car being in the lane nearest to the center line. It appears from a photograph in evidence that after the

collision there was room for cars to pass in the south east-bound lane. The witness, Cox, who was following Locke, testified that he saw the barricade, but didn't remember whether there was a lantern on it at the time of the accident or not. In his deposition he had said that there was a lantern there but he didn't know whether it was lighted. The barricade had not been there the previous afternoon, and at that time he observed a depression there that some cars were hitting, "but they were getting through at that time".

It was shown that the Bureau of Water Supply of Baltimore City had made an opening in the bed of Holabird Avenue on November 3, 1955, to repair a leak in the water main located about 15 feet below the surface. It was about 6 feet in length across the center of the westbound lanes and about 9 feet wide. On November 5, the repair was completed and the hole "backfilled". On November 7, the cut was "cold patched" in accordance with standard practice, and the lanes opened to traffic. Permanent repairing cannot be done until the soil has been compacted by use, but inspections of the patch were made three times a day on November 8, 9 and 10, and the patch showed no signs of depression or wear. It was 5 inches thick and laid over crushed stone.

Officer Heidel, of the Baltimore Police Department, testified that he went on night duty at 12:01 A. M. in a police car. His post included the area in question, and it was part of his duty to look out for road conditions that might be hazardous. At 12:30 A. M. he observed that the cold patch in the bed of Holabird Avenue had settled to a depth of about 8 inches, making a hole about a foot square in the center of the westbound lanes, tapering off toward the north curb, and creating what he thought was a traffic hazard. (The witness, Kecken, testified the hole was 2 feet deep when he saw it after the accident.) Officer Heidel went to a point nearby, where a new street was being laid, and obtained a stringer 10 feet long and a cross-buck painted yellow, with danger signals on it, and a lighted red lantern. With this material, he erected a barricade on the east side of the hole, placing the cross-buck about 5 feet north of the center lines, fitting the stringer into it extending to the north, and hang-

ing the lantern on the cross-buck. He shook the lantern and it seemed to have enough oil in it to last out the night. He then called the Department of Highways and reported what he had found and what he had done. His report was received by the clerk on duty, and a message was left on the superintendent's desk, who received it when he came to work at 7:30 A. M. A crew was then sent to repair the hole. The emergency night crew was apparently not called by the clerk on duty. Officer Heidel testified he drove past the barricade several times during the night and observed the lantern burning, the last time being at 4 A. M. He came to the scene of the accident shortly after it occurred, and assisted in directing traffic. He then observed a smashed lantern near the barricade.

The case against the City rests upon its alleged negligence in failing to keep its streets in a reasonably safe condition for public travel. That such a duty exists is well settled, although the City is not an insurer. See *E. Coast Lines v. M. & C. C. of Balto.,* 190 Md. 256, where many cases are analyzed, and *State, Use Parr v. Prince George's County,* 207 Md. 91. Where traffic hazards exist, particularly where they are of the City's own creation, there is a further duty to take reasonable steps to provide warning of the hazardous condition. *E. Coast Lines v. M. & C. C. of Balto., supra* (unlighted raised grass plot); *Baltimore v. Thompson,* 171 Md. 460 (unlighted girder on bridge); *Baltimore v. State, Use Cirtout,* 146 Md. 440 (no light or other warning at end of paved portion of street); *Baltimore v. O'Donnell,* 53 Md. 110 (no light or other warning except a rope). See also *Rea Construction Co. v. Robey,* 204 Md. 94 (no flares or other warning to mark end of paving on highway under construction), and *Biggs v. M. & C. C. of Balto.,* 129 Md. 686 (no light or other warning at dock end of street). In all of the cases cited, however, there was a complete absence of any warning. In *Baltimore v. O'Donnell, supra,* a lantern had been hung on a rope to give warning, but it had been broken by boys. The person in charge discovered this on the afternoon before the accident, and took the lantern home instead of replacing it with another.

We find no merit in the contention that the City was negligent in making the cut in the street, or in cold patching the opening, or in failing to continue its inspections after November 10, when it was apparently in perfect condition. In any event it was not the proximate cause of the accident. There was no evidence that the settling occurred prior to the late afternoon of November 11, or that it became an actual hazard to traffic until the time Officer Heidel erected the barricade. We find nothing in the evidence to charge the City with constructive notice prior to the time it received actual notice from Officer Heidel at about 1 A. M. He reported the hole, but also reported that he had erected a barricade and placed a lighted red lantern on it. We cannot hold that the City was negligent in delaying further action until daylight, under the circumstances. It would have been impracticable to make repairs until then, as the materials could not be obtained. The only thing that the City might have done, would have been to provide other and further warnings.

If we assume, without deciding, that the City might be held liable if the police officer had acted negligently in providing inadequate warnings, on the theory that it approved and adopted the precautions he took, we cannot find that the warnings were inadequate. The barricade marked the hole and the lantern illuminated the barrier. We cannot find that it was inadequate for the purpose intended. The hazard guarded against was the danger that an automobile might suffer damage from striking an unmarked depression in the roadbed, and the means employed was to indicate the presence of the hole so that motorists might avoid the hole. It was certainly adequate for this purpose, and there is no evidence that anyone struck the hole or the barricade. The westbound lane was not entirely closed, for at least 5 feet next to the center line was left open. It was hardly foreseeable that the erection of the barricade would itself create a danger that a collision might occur in the 25 feet of roadway left open. The collision clearly was the result of negligence on the part of a driver pulling around it without slowing down and without regard to oncoming traffic. It might well have been avoided if Matthews had pulled to his right after pass-

ing the barricade, or Locke had pulled to his right when he first saw the other car. We do not suggest that the negligence of Matthews would necessarily exonerate the City, if his actions had been caused in part by its negligence in failing to provide adequate warnings, but on the other hand the City's liability can only be predicated upon "a failure to use reasonable care to so maintain [the highways] that travelers thereon in the exercise of reasonable care at night or in the daytime may not be subjected to any dangers arising from defects in the construction, upkeep, or maintenance of such highways under reasonably foreseeable conditions * * * ." *Baltimore v. Thompson, supra,* p. 467. Cf. *Mathis v. Atlantic Aircraft Distrs.,* 216 Md. 262, discussing the rule of foreseeability as applied to an invitee.

We think the City cannot be held liable for failure to provide a warning light, if the lantern was extinguished and smashed by a third person after 4 A. M., without notice to it. In 19 *McQuillen, Municipal Corporations* (3rd Ed.), Sec. 54.100, it is said: "* * * but the municipality is not liable where proper warnings, such as barriers or lights or the like, have been put out but are removed by a third person or by accident before the injury, and the municipality has no actual notice 'of the removal, and such a time has not elapsed thereafter as. to charge the municipality with notice thereof and afford opportunity to replace them. Having performed its duty, in the first instance, the municipality is ordinarily not required to keep a man on guard to see that the barriers or lights are not removed; * * *." See also *Primus v. City of Hot Springs,* 256 P. 2d 1065 (N. M.); *McFeeters v. City of New York,* 92 N. Y. S. 79; *Gedroice v. City of New York,* 95 N. Y. S. 645; *Pyburn v. Kansas City,* 148 S. W. 193 (Mo. App.). Cf. *Charles v. Baltimore,* 138 Md. 523.

We conclude that the precautions taken were reasonably adequate to meet the situation and that the City's motion for judgment *n. o. v.* should have been granted. Our conclusion on the point of primary negligence makes it unnecessary to discuss the other points argued.

> *Judgment reversed, costs to be paid by the appellee.*