# CHARLESTON.

JOSEPHINE LEE RILEY *v.* CITY OF RONCEVERTE

(No. 6507)

Submitted November 12, 1929.  Decided November 19, 1929.

*H. L. Van Sickler* and *Holt & Holt,* for plaintiff in error.
*McWhorter, White & Browning,* for defendant in error.

Woods, President:

This is an action of trespass on the case, instituted in the circuit court of Greenbrier county, to recover for damages resulting from injuries alleged to have been caused by reason of a collision of an automobile in which plaintiff was then a passenger, with an alleged obstruction in the streets of the city of Ronceverte. This writ is prosecuted to a judgment in favor of the city.

The alleged obstruction, which is located at the intersection of Frankford Road and Main Street, is what is commonly known as a "silent policeman" or traffic guide. It is an ordinary galvanized hot-water tank (about 11¾ inches in diameter) filled with cement, and is so planted that the top rises about 34 inches above the surface of the street. Its position in relation to the intersection is 16 feet from the left and 13 feet from the right curb of Frankford Road, as a party proceeds north toward Lewisburg, and in the south edge or curb-line of Main Street. Such a traffic guide had been maintained at this point for four years prior to the accident. It is also in evidence that five other intersections in the city of Ronceverte are provided with similar guides.

Plaintiff arrived in Ronceverte on the evening of the accident on the train and was met at the station by her brother-in-law. At the time of leaving for the latter's home (in the direction of Lewisburg) night had fallen. According to the brother-in-law, whose testimony is corroborated by the plaintiff, he was required, by reason of the downpour of rain, to look around the edge of the windshield in order to properly direct the course of the car. After leaving the railroad station the car was driven out to Frankford Road, where it passed around a "silent policeman", and then north on that road in the direction of Lewisburg. Before reaching the next intersection (Main Street) the driver inclined the car to the left to avoid two other cars which were parked on the right-hand side of Frankford Road fifty feet south of Main Street, and after passing them, turned back toward the right of the street. The left front wheel of the car struck to the left of the center of the "silent policeman", and after re-bound the frame of

the car struck it. Both occupants of the car testified that they could not see the traffic guide. The driver stated that he had visited Ronceverte during the four years previous to the accident on an average of once every three weeks and had used the Frankford Road about half of the time; that he knew of the presence of the traffic guide; that he drove into Ronceverte on the evening of the accident over that road. The plaintiff testified that she had averaged two trips a year to her sisters for some years prior to the accident; and that she had traveled the Frankford Road on such occasions. On being asked if she had seen the traffic guide, she replied: ''Each time I passed in the daylight on all other occasions I have seen the 'dead man'.'' Other facts necessary to a decision of the case will be dealt with later in this opinion.

The breach of duty set up in the declaration is that the city had caused the said traffic guide to be set or placed in an upright position in the traveled portion of the said road and intersection without painting or lighting it so that the same would be visible to travelers on the highway. As to this specification of negligence the city claims that the ''silent policeman'' in question was placed in its present location by direction of the proper officials, for the regulation and direction of traffic, and in the exercise of a governmental duty; and that suitable lights were maintained by it in the vicinity thereof, during the night, sufficient to inform travelers of its presence, while in the exercise of ordinary care in the use of the way.

The plaintiff proceeded on the theory that the street was out of repair. In fact, she invoked the only remedy given her under the law, that of Code, Chapter 43, section 167, which provides that any person, who sustains injury to his person or property by reason of any street in an incorporated city, town or village, being out of repair, may recover all damages sustained by him by reason of such injury, in an action on the case in any court of competent jurisdiction, against the city, town or village, in which said street is located. This right of action is limited, however, to such city, town or village, where its charter requires it to keep its streets

in repair. The defendant city stipulated on the record here the fact to be that its charter does so require. Thus, it will be seen that the case hinges on the fact whether the street was out of repair, and being out of repair, brought injury as a result to the plaintiff.

The identical question raised here has not undergone judicial determination in this state. But the principle involved has been considered and applied with reference to other obstructions on a street. Before imposing liability, we must determine whether the street was out of repair in the sense of the statute. Being out of repair as applied to a street this Court has said means not reasonably safe for travel by the ordinary modes by day or night, which is a practical question. *Holsberry* v. *City of Elkins,* 86 W. Va. 487; *Whittington* v. *Jefferson County Court,* 79 W. Va. 1. Or, in other words, about all that can be said by way of general rule is that cities, towns and villages are simply required to keep their streets in a reasonably safe condition for persons traveling them in the usual modes by day or night, and exercising ordinary care. *Yeager* v. *City of Bluefield,* 40 W. Va. 487. Whether the city has been negligent to the extent of permitting its streets to be out of repair, is therefore dependent on the circumstances of each particular case. *Arthur* v. *City of Charleston,* 46 W. Va. 88. When, in the course of events leading up to the injury to the plaintiff, did the street in question become defective? It is shown in evidence that the "silent policeman" was installed by the city four years before the time of the accident. It had remained there all this time, serving its purpose of directing traffic at a congested center of travel in the municipality. We take judicial notice in this day of the common use of such devices at such locations, and that they do serve a useful purpose in directing traffic and promoting obedience to law. The complaint of the plaintiff narrows to the one question that it was not painted or lighted.

The city introduced testimony to the effect that, while the traffic guide, which was composed of galvanized material, was neither painted nor lighted, it maintained a light at the intersection, within a few feet of said guide, and lights on Frank-

ford Road above (north of) Main Street; and that these lights were sufficient in power to reveal objects in the vicinity thereof at night. These lights were shown to have been lighted at the time of the collision. In addition, there was a large street light maintained by the Bowers Drug Store right opposite the "silent policeman". Added to this was the direct evidence of a person, who, at the time of the collision, was standing in the door of the garage located seventy-five feet south of the traffic guide, and on the right of Frankford Road. He testified that he saw the accident, and that he could at the time see the "dead man" from his station.

Of course these facts concerning the lighting of the street in the immediate vicinity of the traffic guide are controverted by the driver of the car and the plaintiff, to the extent that they did not see it. The question thereupon became one for jury determination. Their verdict for the city on this basic question was fully warranted by the evidence. This conclusion makes it unnecessary to decide other questions raised on the record.

*Affirmed.*