PAUL D. DeLAHUNTA ET AL. v. CITY OF WATERBURY

SUPERIOR COURT     NEW HAVEN COUNTY     FILE No. 14595
AT WATERBURY

Memorandum filed June 9, 1947.

William K. Lawlor and Bronson, Lewis, Bronson & Upson, of Waterbury, for the Plaintiffs.

Maurice T. Healey and Edward J. McDonald, of Waterbury, for the Defendant.

CORNELL, J. Plaintiffs are the driver (who also claimed to be the owner) of a motorcar and three occupants therein, one of whom was the operator's wife. On March 22, 1942, at about 12:30 a. m. while proceeding homeward to Lordship in the

town of Milford from Watertown, the vehicle collided with the concrete base of a traffic light stanchion (sometimes referred to as a "silent policeman") which stood on Watertown Avenue in Waterbury in an area where that thoroughfare is intersected on its west side by Robbins Street. All of the plaintiffs received severe, and some of them, very serious and painful injuries. The jury rendered verdicts in favor of all the plaintiff occupants and for the defendant city as respects the driver. The city moves to set aside those against it; the operator of the car does likewise respecting the verdict against him.

The basis of liability relied upon is stated in paragraph 4 of the complaint, which alleges that "Said stanchion was so placed and maintained that it constitutes a nuisance and a continuing condition, the natural tendency of which was to create danger and inflict injury upon persons or property, especially whenever weather conditions were as described." The "weather conditions" referred to, as the complaint recites them, were that ". . . a heavy rain was falling and a strong wind was blowing so that the visibility was very poor with the result that the stanchion could not be seen by a driver watching the road and it surroundings and with a light of the blinker type that shed no light on the obstruction below." If the structure was not a hazard under usual conditions and became such only under those described as prevailing when the collision occurred, the complaint would state no cause of action in nuisance. *Orlo* v. *Connecticut Co.*, 128 Conn. 231, 242; *Andrews* v. *Bristol,* 120 Conn. 499, 503; and see *Scoville* v. *West Hartford,* 131 Conn. 239, 242 (defect in highway).

Its allegations must, therefore, be construed as meaning that, while the structure in the highway was more dangerous under the weather conditions described when the collision occurred, it possessed a natural tendency to present danger at all times. The facts stated describe a nuisance as a matter of fact as contrasted with one absolute and as a matter of law. That is, it is not claimed that the stanchion was inherently "so hazardous as to make the danger extreme and serious injury so probable as to be almost a certainty," but rather that it had a "natural tendency to create danger and inflict injury." *Andrews* v. *Bristol,* supra, 502; *Wolfe* v. *Rehbein,* 123 Conn. 110, 116. There is no allegation to the effect that the structure was an "intrinsically dangerous agency, the necessary and obvious effect of which is to cause harm," but only that it had a natural tendency to do so (*Brock-Hall Dairy Co.* v. *New Haven,* 122 Conn. 321, 326)

under the surrounding circumstances. *Karnasiewicz* v. *New Britain,* 131 Conn. 691, 694; *Bacon* v. *Rocky Hill,* 126 Conn. 402, 412. As respects such "surrounding conditions," the complaint does not make any distinction between daylight and darkness. The statement contained in paragraph 6 to the effect that, inter alia, the stanchion could not be seen "with a light of the blinker type that shed no light on the construction below" does not purport to say that the structure could not have been seen or was difficult to discern during the day season or even at night under normal or ordinary conditions. It is a description only of its alleged lack of visibility under the weather conditions obtaining when the car collided with its base. That plaintiffs may have the benefit of that construction of the complaint, however, which has the greater tendency toward furnishing a basis for the verdicts rendered, it will be interpreted as alleging that the structure is a nuisance at all times but possessed a greater tendency toward visiting harm at night, under the conditions surrounding its location.

As respects the structure, itself, there is no conflict in the evidence. It was built in the latter part of October, 1940, at the time that the concrete pavement was placed on Watertown Avenue at and in the vicinity and north thereof. It consists of a concrete base with a superstructure of metal surmounted by three large blinker lights. The whole below the blinker lights, inclusive of the concrete base, is painted white. The concrete base is about three feet, two inches square at the pavement and extends above the pavement to a height of three feet, eight inches, at which point it is one foot eleven inches square. It weighs about four thousand five hundred pounds and aside from its weight is secured from being moved by four steel dowels, each three-quarters of an inch in diameter, one at each corner, each of which extends down into the pavement for a distance of six inches and up into the concrete base for a distance of four inches. A wire enclosed in a small pipe lying underground connects with a manhole nearby and projects up through the center of the base into the superstructure where it contacts the light fixtures and furnishes electricity to them for illumination. On the top of the structure are three blinker lights, one of which flashes red in the direction of Robbins Street, which at that point intersects Watertown Avenue from the west; the two others flash an amber light to the north and south of Watertown Avenue. They are equipped with sixty watt, 120 volt

bulbs. The height of all these blinkers from the surface of the pavement to the center point of each is nine feet, six inches, and from the top of the concrete base of the stanchion to the blinker lights is six feet. These blinker lights automatically flash continuously night and day at the rate of fifty-five times per minute. The fixture above the concrete base has four sides or panels, one of each of which faces north, east, south and west. Immediately under the blinker lights there is a metal hood which flares outward, one section on each of such panels, underneath and within each of which is an electric light equipped with a sixty watt bulb. These bulbs are lighted only during the darker hours and at night. They throw a white light down over the white-painted structure below them and onto the concrete base and for a distance of about three feet, eleven inches, on the pavement about the base.

The "surrounding conditions" in which it is claimed that the traffic stanchion constituted a nuisance are substantially these: Watertown Avenue, which is a main artery of travel between Waterbury and principal points north and south to Waterbury and points further south, lies in a generally north-south direction. As already noted it is intersected on its west side by Robbins Street, which does not cross it. In the area here pertinent it is paved with concrete, which at the intersection in question and for a distance of about one hundred feet to the north and south of it is about fourty-seven feet wide, and beyond such areas, in both directions, about fourty-five feet in width. The curb lines of Robbins Street flare outward where they meet Watertown Avenue. Its width between curbs at a point where such flare begins, which is about thirty feet west of Watertown Avenue, is about fourty-eight feet. As Robbins Street goes west from its intersection with Watertown Avenue it has a rising grade of 8 per cent. On its west side south of the intersection there are dwellings on Watertown Avenue; on the northwest corner of Watertown Avenue and Robbins Street there is a gas station with an entrance opening on Watertown Avenue, the southerly line of which is about     feet north of the north curb line of Robbins Street where the latter meets Watertown Avenue; the building on this property is set well back from the street lines of both these thoroughfares; adjoining the gas station property on the north and running along the west side of Watertown Avenue in that direction is property of the Waterbury Hospital which extends for a distance of several hundred feet and on which there are no buildings facing on Watertown

Avenue. Watertown Avenue has no perceptible grade north of the intersection and is straight and substantially level for a distance of at least seven hundred feet to the north, at which point it turns toward the east in a gradual curve. On the west side of Watertown Avenue at a point about six hundred and fifty to seven hundred feet north of the traffic stanchion is a sign reading "Speed limit 25 miles per hour," and at a point about five hundred and tweny feet north of such intersection, another which gives warning that there is rotary traffic ahead. The concrete pavement could not practicably be laid in one sheet across Watertown Avenue because of the effect of expansion in warm and contraction in cold weather. To allow for this it has spaces between sections lying horizontally (that is transversely) on Watertown Avenue and also parallel with it (that is longitudinally), the horizontal spaces being slightly larger than those lying in a north-south direction and calked with asphalt; the others are filled with thin chestnut slabs, bound together with steel and are without tar or other material. The purpose of this is to prevent water from seeping into the joints. Those which lay north and south (in the same direction as Watertown Avenue) are in number and width counting from the east side of that highway, as follows: (1) eleven feet; (2), twelve feet; (3), twelve feet; (4) eight feet; in addition to which there is a portion lying between the eight-foot section and the westerly curb of Watertown Avenue four feet in width. There are no directional or other traffic lines painted on the surface of either Watertown Avenue or Robbins Street approaching the intersection or at any other area, but on Rob bins Street there is a "stop" sign on the south side located thirty feet west of the west curb line of Watertown Avenue. On the flat surface of the concrete base is painted a large black arrow pointing to the west, above which in the same color is the word "Slow" and below which the words "Turn Right". Similar appropriate directions appear on the other sides.

The traffic stanchion is placed on Watertown Avenue in the third longitudinal section from the east in such a position that the easterly line of its base at the pavement is five feet west of the center line of the paved portion of that highway, and the center line of Robbins Street if extended across Watertown Avenue would pass through its base at a point one foot north of the center line of such base. In this position, there is left on the east side a clear and unobstructed area for northbound traffic of about twenty-eight feet in width, and on the west

side of the stanchion about fourteen feet between it and the west curb line of Watertown Avenue as extended across Robbins Street. In this location of the stanchion a motor vehicle proceeding south on the extreme right hand side of Watertown Avenue would not be required to alter its course to pass the stanchion on the latter's west side while if it so approached from that direction in a course at or close to the middle line of the highway it would be required to turn left a few feet to go by the fixture. The abruptness of such turn would depend upon the proximity of the vehicle when made and would be less perceptible the greater the distance therefrom.

The presence of the traffic stanchion as above described in the surrounding conditions referred to was claimed by plaintiffs in their complaint to have a natural tendency toward endanger-reasons, namely (a) its position on the third section of the concrete where it was west of the center of the highway and (b) because the structure below the blinker lights was allegedly invisible so that to the driver of a motor vehicle proceeding south toward it the illusion was created that the blinker light was suspended from a wire instead of being affixed to the structure described. The first of these, it is maintained, was a continuing condition. The second, so far as the evidence discloses, only obtained under the weather conditions existing at the time of the collision so far as is indicated. The first mentioned, (a) depends upon the claimed theory that there is a natural tendency of operators of motor vehicles to drive on and stay within a section, or, as in the instant case, the space between longitudinal joints of the concrete, and that, consequently, the location of the stanchion within one of these constituted a dangerous obstruction to the course of traffic proceeding in a southerly direction at the point.

It would be difficult to mistake the problem with which the defendant city was faced and in connection with an attempted solution of which the stanchion in question was employed. Approximately ten thousand motor vehicles of all types—for the most part, passenger cars, but including a goodly assortment of trucks, delivery vehicles and busses—moved north and south daily on Watertown Avenue, and about three thousand each day entered Robbins Street from or issued therefrom onto Watertown Avenue. Those moving into Robbins Street came from two directions, namely, from the west side of Watertown Avenue when southbound and the east side of Watertown

Avenue when northbound thereon; those coming from Robbins Street intending to go north on Watertown Avenue were required to pass through the southbound traffic on Watertown Avenue and enter the line of northbound traffic on that highway. Those issuing from Robbins Street intending to go south on Watertown Avenue were compelled to enter the southbound traffic on the west side of Watertown Avenue. To keep this traffic moving and also furnish as much protection as possible to vehicles entering from any direction into and going in any direction from Robbins Street it is obvious that the use of traffic lights was necessary at the intersection, either placed on poles or standards at the corners of the two streets or suspended over the middle portion of Watertown Avenue. It is patent, however, that while such a device would afford notice of the intersection and of the necessity of exercising caution at the point it would not control the course which traffic would be required to follow to insure greater safety there. It is plain, and the jury could have reasonably reached no other conclusion than, that the purpose of the structure surmounted by the flashing blinkers was not only to signal caution to drivers approaching the intersection but, together with the large black lettering and directions painted on the white base, to indicate the course to be followed and to make it necessary to do so by interposing the stanchion as an obstacle to prevent traffic from doing otherwise. This, in short, was to compel traffic intending to enter Robbins Street or to go north therefrom to make a full wide turn by forcing it to go around the stanchion, thus eliminating the hazard that would be present if vehicles were prevented by the presence of signal lights only from choosing their own course and making short turns there.

All traffic regulators of the type described are obstructions in the highways but that circumstance does not make them nuisances. "We take judicial notice of the common use of such devices at such locations, and that they do serve a useful purpose in directing traffic and promoting obedience to the law." *Aaronson v. New Haven,* 94 Conn. 690, 695; *Riley v. Ronceverte,* 108 W. Va. 222. Cases dealing with municipal liability for personal injuries or property damage due to collision with the same or similar structures are relatively few. Most of them are concerned with the question whether, in particular circumstances and under local law, one may constitute a defect in the highway. Two are examined in a note in 12 A. L. R. 333, where *Aaronson v. New Haven,* supra, is reported at page 328,

and a number in 39 A. L. R. 781, in which at page 777 there is reported *Vicksburg* v.*Harralson*, 136 Miss. 872. In addition, there are *Young* v. *Camden,* 187 S. C. 414; *Reegan* v. *Galveston,* (Tex.) 24 S. W. 2d 61; *Riley* v. *Ronceverte*, supra; *Crowell* v. *Malden,* 273 Mass. 456, and *Whalen* v. *Worcester Electric Light Co.,* 307 Mass 169. As, however, a nuisance under our law may also be a defect (*Karnasiewicz* v. *New Britain,* supra), if the condition is not one created and maintained by a municipal corporation (*Parker* v. *Hartford,* 122 Conn. 500, 504) the principles formulated and applied in the authorities referred to are in point here, to the extent that whether or not the condition complained of has a natural tendency to produce injury to persons in lawful use of a highway is ordinarily a question of fact for the trier to decide. Though an obstruction per se, the decisive consideration in a determination whether such an obstruction may be found to be a nuisance is whether it is sufficiently conspicuous to apprise the drivers of vehicles of its presence and location so that in the exercise of due care it may be seen in time to control the speed and direction of a vehicle to avoid striking it. See *Aaronson* v. *New Haven,* supra, 695; *Riley* v. *Ronceverte,* supra. This is aptly illustrated by the opinion in the case of *Wenzel* v. *State,* 178 Misc. (N. Y.) 932, where a traffic stanchion of somewhat similar design to that involved here, but apparently not illuminated below the signal lights at the top so that the base was not seen, was held to be a nuisance; while in *Riley* v. *Ronceverte,* supra, a "silent policeman" was held not to be a defect in the highway though there were no lights upon it, but the area was sufficiently lighted to reveal its presence to motorists using due care.

By this test the structure involved here could not possibly be found to possess a natural tendency toward danger to a traveler employing ordinary care. The amber blinker light atop the device, flashing fifty-five times per minute, could be seen as far as the eye, unobstructed by physical objects, could perceive anything. As applied to the topography north of the stanchion, the latter came into view as soon as a vehicle rounded the turn about 700 feet to the north. The understructure inclusive of the base was observable at practically the same distance in clear weather and substantially the same was, true in light rain. At night, in a heavy downpour, the entire structure was visible, inclusive of the base, at as great a distance but the flashing of the blinker lights on the concrete was more noticeable due to the reflective power of wet pavements. The lack of conspicu-

ousness which, alone, could have converted the stanchion from a legitimate exercise of a governmental duty extènded to promote the safety of thousands of persons using the highway every day into a menace to users of such highway is lacking, and there was no evidence before the jury upon which a contrary conclusion could have been reached except by ignoring the physical facts and uncontradicted evidence. Necessarily, if the operator of a motor vehicle in the use of ordinary care moving south on Watertown Avenue was afforded ample notice of the presence and location of the stanchion, he was required by statute to follow its direction. General Statutes § § 394, 1639. This requirement of necessity supersedes any proneness on the part of drivers to proceed on a certain concrete strip and to impute a natural tendency to the stanchion toward danger out of the circumstances that it was located on such a strip. The contention that the standard was a nuisance because it gave the illusion of consisting only of a traffic light suspended from wires is not supported by any evidence save that of the driver of the plaintiff's car, who offers it also as an explanation for his conduct in not avoiding a collision with the base. It predicates on the premises that the base and superstructure below the light were not illuminated so as to reveal the base, which, as noted, is repudiated by uncontradicted evidence and the physical facts.

The claim made in the complaint is that the stanchion was a nuisance at all times; that only the degree of its danger was increased under the weather conditions prevailing when the collision occurred. There is no evidence to support this contention. If, in fact, the body and base of the stanchion were obscured by an exceedingly heavy rain at the time of the collision, that would not constitute it a nuisance if ordinarily it had no tendency to present danger. "The plaintiff's injuries thus came about because of an unusual combination of circumstances and the conditions previously existing could not reasonably be found to be such as would have a natural tendency to produce them. Those conditions did not constitute a nuisance as regards the risk of such injuries." *Orlo* v. *Connecticut Co.*, 128 Conn. 231, 242. Since the city used reasonable care in the construction of the traffic stanchion and it was sufficiently conspicuous to travelers exercising due care, if the jury found that it thereafter became temporarily dangerous "by reason of natural causes against which there [was] no safeguard that the city might reasonably be required to adopt, the city is not liable

upon the ground of nuisance." *Andrews* v. *Bristol,* 120 Conn. 499, 503. If the stanchion in its surrounding conditions was not a nuisance it could not be the proximate cause of the plaintiff's injuries. "Whether an act be legally designated as negligence or nuisance, in order to form the basis of recovery in a civil action, the act must be a substantial factor in causing the damage. If the damage is caused directly and exclusively by an act of God it could not be due to negligence or nuisance." *Beauton* v. *Conn. Light & Power Co.,* 125 Conn. 76, 81.

The foregoing relates to the claims stated in the complaint. Apparently, however, on the trial the plaintiff sought to show that the traffic stanchion was a nuisance because it was not installed with the written consent or approval of the state traffic commission as required by Cum. Sup. 1935, chap. 25, as amended by Cum. Sup. 1937, Chap. 25. It is unnecessary to review the evidence on this score. Although the proceedings of both the board of police commissioners as the traffic authority of the defendant city as well as those of the state traffic commission were very informal, there is no question that, in fact, a written permit was issued under which and in accordance with the policy of the state traffic commission at that time the stanchion in question was erected and placed where it was when the collision occurred. This being so, the action of the state traffic commission in issuing such permit is not subject to collateral attack. *State ex rel. Lacerenza* v. *Osborne,* 133 Conn. 530, 535. Other incidental questions in that connection need not be discussed except to say that none of them avail the plaintiffs.

The jury's verdicts for the plaintiffs are in conflict with the physical and admitted facts and uncontradicted evidence. If they reflect the influence of sympathy, particularly in the case of plaintiff Bessie DeLahunta who suffered serious and painful injuries, that is understandable. In the time elapsed since the instant motions were filed ample opportunity has been afforded, however, to effect some sort of compromise with defendant if such were possible. On the view of the evidence and applicable law as stated above, however, the verdicts for the plaintiffs Bessie DeLahunta, Edwin MacKeever and Doris MacKeever are set aside. Plaintiff Paul D. DeLahunta's motion to set aside the verdict against him is denied.