FRANK BROCATO ET AL. *v.* CHARLES SERIO
[No. 70, October Term, 1937]

*Decided January 12th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*David Ash,* with whom were *Albert L. Sklar* and *T. Warren Rice* on the brief, for the appellants.

*Hyman Ginsberg,* with whom were *John J. Laukaitis* and *Ginsberg & Ginsberg* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The cause of action in this case is a promissory note for $2,000, dated August 12th, 1932, and payable two years after date thereof, to the order of Charles Serio, the appellee, with interest thereon at the rate of six per cent.; the same purporting to be signed by Santa Brocato and Frank Brocato, the appellants. The suit was brought in assumpsit, in the Baltimore City Court; the declaration containing one count, which sets out the note and the default in its payment. To this declaration the defendants filed the general issue pleas of never promised as alleged and never indebted as alleged. The case was submitted to the court, sitting as a jury, which rendered a verdict in favor of the appellee, plaintiff below, in the sum of $2,500. From the judgment extended on said verdict this appeal is taken.

At the conclusion of the testimony of both the plaintiff and the defendants, the defendant Santa Brocato offered four prayers, and the defendant Frank Brocato offered three prayers, all of which were refused by the trial court. The ruling of the court upon the prayers forms the basis of the single exception found in the record; and for the purpose of considering this ruling it becomes necessary to review the evidence.

At the trial the plaintiff produced as a witness Frances Serio, who testified as follows: That she was a sister-in-

law of the plaintiff and a cousin of Frank Brocato, and was present at the time the note was executed; that Frank Brocato and Santa Brocato were husband and wife, and that they and their daughter and an aunt of the witness were also present, the aunt referred to being the widow of Sam Brocato, hereinafter mentioned; that Santa Brocato executed the note, and handed it to the witness for delivery to the plaintiff at that time; the note was delivered to her for the purpose of renewing a former note, dated February 13th, 1928, in the sum of $2,000, signed "S. Brocato & Son," which latter note appears to have been a renewal note for an original loan, made approximately fourteen years prior to the date of the trial, to the firm of S. Brocato & Son. The witness then explained that, shortly prior to the time of the original loan, at the request of Frank Brocato, she met Santa and Frank, her uncle Sam, and the latter's wife, whose Christian name does not appear in the record, all of whom requested her to make them a loan of $2,000; she informed them that she was not in a position to make the loan, because her husband was not on good terms with the applicants; whereupon Santa Brocato asked if she would not endeavor to secure the loan from the plaintiff; that she did interview the plaintiff in behalf of the applicants, who consented to make the same; that she was present when the check representing the loan was delivered to Frank Brocato, who in turn handed it to his wife, who put it in her pocket, and that this transaction took place in the presence of Sam Brocato, who was then in bed; "at that time each one spoke and said, we will never forget Charlie, for this, he surely is good. She said, Charlie, remember we owe you this $2,000; we will pay you just as soon as we can. Santa said that with Frank Brocato." Continuing, the witness testified that the firm at that time consisted of the two defendants and Sam Brocato and his wife, and that the original loan was made to that firm. While the original note does not appear in the record, it does appear from a photostatic copy found in the record that on February 13th, 1928, a note for $2,000, payable

to the order of Charles Serio, was signed by "S. Brocato & Son"; and according to the testimony of Mrs. Serio, the witness, as to this latter note, the signature of the firm was placed thereon by Santa Brocato, and it was delivered to her, and through some omission, not surrendered at the time of the acceptance of the note forming the basis of this suit. The witness also testified to the execution of at least one other note by way of renewal, by Santa Brocato on behalf of the firm; that it was about six months or a year after the money was actually loaned that the first note was given; that, at the time the original loan was made, it was contemplated that it would be paid off in six months, from the proceeds of the sale of certain property belonging to the borrowers, or at least some of them; that during the last illness of Sam Brocato, she collected $60 on account of interest from Santa Brocato, who then told her to tell the plaintiff that she would give him another $60 later; this she subsequently paid; that, after the death of Sam Brocato, at the request of the plaintiff she called on Santa Brocato for a new note; that the latter made out another note, signed "S. Brocato & Son," which she took back to the plaintiff, who stated that it was not satisfactory, because Sam Brocato was dead; she again saw Santa Brocato, who stated that she did not have a new blank note; a week later she called on Santa Brocato, who then had the note in controversy prepared and in her possession, and that in her presence, and in the presence of Frank Brocato, Santa signed this note. Upon cross-examination, she stated she did not know whether Frank actually signed the note, or whether his name also was affixed in his presence by his wife.

The plaintiff, when called, corroborated his sister-in-law as to the manner in which the loan was originally negotiated, stating that he was not related to the Brocatos; that the death of Sam Brocato occurred prior to August 12, 1932, the date of the cause of action; that he collected interest on the loan for a number of years from Sam Brocato. He was then asked by the court: "Q. Did you lend it to Mrs. Frank Brocato? A. No, sir, I loaned

it to them; I loaned to Brocato & Son, and then the father he died; after the old man died I went and renewed the note, and I said—they wrote Frank Brocato & Son again; I said, No, this wouldn't be no good any more, you have to put your wife's name and your name in here, which I got the note from both of them"; that at the time of the original loan, Sam Brocato and his wife, and Santa Brocato and her husband, were engaged in a business in Hollins Market; that the original note was not then given, but was later delivered to him, signed "S. Brocato & Son"; that the transactions between the parties were usually conducted through his sister-in-law, but that after the death of Sam Brocato he made demand on Frank and Santa Brocato for the repayment of the money; that both of them said they were going to repay the indebtedness, and were going to secure a loan from the government for the purpose; that originally they had promised to pay the money from the sale of "shore" property; that Sam Brocato and his son and son's wife all actively engaged in the Hollins Market business during the lifetime of the former, and traded as Brocato & Son.

In direct conflict with the plaintiff's side of the controversy, Santa Brocato testified that Sam Brocato, her father-in-law, was in the fruit business and that her husband worked for him on a salary of twenty dollars a week and board; that she had nothing to do with the business; that sometimes Sam Brocato needed her down at the market, and on these occasions he paid her for her work; that she was called on to help out from time to time; that sometimes she attended to the bookkeeping, because the father-in-law could not read; "he could not see so good and he said to me to write for him something; I did writing for him and signing things, that is all; I remember signing that note 'Sam Brocato and Son'; my father-in-law told me to write up something for him; I don't remember whether I was present at the time that my father-in-law got some money from Serio"; that, after the death of Sam Brocato, Frances Serio presented to her a note, and told her to sign it, because her father-in-law

owed the plaintiff the money; that she did not want to sign, and refused to sign on account of the absence of her husband, but that she did sign her own name, and also that of her husband, notwithstanding her disposition to the contrary, for the reason that Mrs. Serio had made her so nervous; that she did not receive the check for the $2,000 original loan, as testified by Mrs. Serio; that she knew nothing of the claim against her until after the death of her father-in-law; she denied that at that time the note was filled in. The witness then added: "Afterward I told him (her husband) that I had signed this. He did not want me to sign. I said, it is all over, what are you going to do?" There is nothing in the record to show that the husband at that time, either in action or words, answered the latter query.

When called in his own behalf, however, he testified that his father, Sam Brocato, was engaged in the fruit business for some years at 1122 West Baltimore Street, and that he died on or about December 24th, 1931; that he conducted the business alone, and that he (the witness) worked for him at a weekly salary of twenty dollars and board; that because of the number of persons in that locality bearing the same name as his father, the business was conducted in the name of "Sam Brocato and Son" for the purpose of identification; that the father could not read English, and for that reason Santa Brocato attended to his checks; that she received no compensation; that they all lived together, namely, father and mother, and son and daughter-in-law; that the mother was still living; that he knew the plaintiff, but did not know that he ever had any dealings with him, and if the plaintiff had any business with his father, he did not know; that he knew nothing of the alleged loan of $2,000 to his father until after the latter's death, when demand was made upon him by the plaintiff; that he never signed any note; that the father left no estate; that during the course of the conduct of the business, his father carried a bank account; that his wife attended to the business of signing checks and making out bills, and that, at the time they were in

business in the market, she helped out in the conduct of the business. This witness denies any knowledge of the execution of the note; but admits that his father was an invalid for some years before his death, and that the business was continued and his wages paid out of the profits of the business; and he expresses his lack of knowledge as to whether his father owned any real estate. His testimony indicates that the title to the property which was used as the home of the Brocato family was in his mother and wife.

The record indicates that the A prayer of each of the defendants was not offered until the close of all the testimony, but nevertheless, asked for an instructed verdict based upon the uncontradicted evidence of the plaintiff alone. Such a prayer at this stage of the case was entirely erroneous, for the reason that it would have eliminated from the consideration of the court, sitting as a jury, the evidence which had already been adduced by the defendant, and was therefore properly refused. 2 *Poe, Pl. & Pr.*, sec. 295-B.

The second prayer of the defendant Frank Brocato is similar to the third prayer of Santa Brocato, in that both prayers ask for an instructed verdict based upon the entire evidence adduced in the case. In 2 *Poe, Pl. & Pr.*, sec. 295, it is said: "A prayer seeking to take the case away from the jury, on the alleged ground of total failure of evidence to support the plaintiff's case, will not be granted, if there is any evidence, however slight, legally sufficient as tending to prove it, that is to say, competent, pertinent and coming from a legal source, but the weight and value of such evidence will be left to the jury." Upon this theory, it is conceded that a case should not be taken from the jury upon a prayer that there was no sufficient evidence to justify the finding for the adverse party, if there be any evidence from which a rational conclusion may be drawn as opposed to the theory of such a prayer. In other words, before such prayer can be granted, the court must assume the truth of all the evidence before the jury tending to sustain the claim or

defense, as the case may be, and of all inferences of fact fairly deducible from it; and this though such evidence be contradicted in every particular by opposing evidence in the case. *Taxicab Co. v. Emanuel*, 125 Md. 246, 93 A. 807; *McElderry v. Flannagan's Admr.*, 1 H. & G. 308; *Leopard v. Ches. & Ohio Canal Co.*, 1 Gill 222; *Jones v. Jones*, 45 Md. 144, 154; *Mallette v. British-American Assurance Co.*, 91 Md. 471, 46 A. 1005; *Moyer v. Justis*, 112 Md. 220, 76 A. 496.

Article 75, section 28, subsection (108), of the Code of Maryland, provides as follows: "Whenever the partnership of any parties, or the incorporation of any alleged corporation, or the execution of any written instrument filed in the case is alleged in the pleadings in any action or matter at law, the same shall be taken as admitted for the purpose of said action or matter, unless the same shall be denied by the next succeeding pleading of the opposite party or parties."

Under the pleadings in the instant case, it therefore follows, that the execution of the note upon which the suit was brought must be taken as admitted; the same not having been denied by the next succeeding pleading of the defendants. But inasmuch as the declaration does not allege a copartnership as between the defendants themselves, or as between the said defendants and others, it also follows that the state of said pleadings does not operate as an admission of such copartnership against the defendants. *Fifer v. Clearfield Coal Co.*, 103 Md. 1, 62 A. 1122; *Banks v. McCosker*, 82 Md. 518, 525, 34 A. 539, 541.

In the latter case it is said: "We think it very clear that the legal effect and meaning of the statute is that the next succeeding pleading must in terms deny the signatures of the maker and of the payee as well, and we do not think the general issue plea is such a denial as the law contemplates."

It is contended by the appellants, under the authority of the case of *Fifer v. Clearfield Coal Co., supra*, that the admission contemplated by the statute cannot be so con-

strued as to also embrace an admission of the agency of Santa Brocato to execute the note sued upon, on behalf of her husband, Frank Brocato. We find it unnecessary, for the purposes of our conclusion, to pass upon the latter question, because in this case, as distinguished from the cited case, the question of partnership and not that of agency arises. In other words, if under all the evidence in the case before us, the court, sitting as a jury, found from the facts that the partnership sought to be established by the plaintiff was existent, then, under the law of this state, either of the partners had authority to execute any instrument on behalf of the copartnership, in the general conduct of its business; and whether the transaction now under consideration was one involved in the partnership business was also a question of fact for the court, sitting as a jury; unless, however, the partner so acting has, in fact, no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority; and there is no evidence in this case that such authority was lacking in Santa Brocato, if the fact of the partnership was established.

It is true that the note in this case was not signed in the original partnership name, but it is not denied that it was issued as a renewal of the original note, which was executed in the partnership name. The reason for its execution by the signers individually is apparent, because a renewal note executed in the firm name was not acceptable to the plaintiff, after the death of Sam Brocato, and the note now in issue was then executed by Santa Brocato (the same person who had signed the original and renewal notes), in its place and stead, in the individual names of two of the alleged surviving co-partners.

"The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Code, art. 73A, sec. 29. One of the causes of dissolution of a partnership is the death of a partner. After dissolution, a partner can bind

the partnership by any act proper for winding up partnership affairs or completing transactions unfinished at dissolution; subject, however, to certain exceptions under the partnership law of this state, none of which are applicable in the instant case. In 47 *C. J.* 841, it is stated: "A contract or transaction connected with the firm business and within the apparent scope of such business, in the name of an individual partner, is binding on the firm and all the partners * * * where the partners have consented to, or acquiesced in, the use of the individual partner's name in firm transactions. * * * The use of an individual partner's name, however, raises a strong presumption that the contract is his separate contract, and not the contract of the firm, except where the other partner is a dormant one; and in order to bind the firm it must be shown that the contract was a partnership matter; and whenever the individual members sign their individual names, and not the firm name, there must be something either in the agreement itself or in the nature of the transaction to which it relates which shows it to be a partnership undertaking." The same authority, at page 826, in dealing with the question of rights and liabilities of partners with reference to third persons, has this to say: "A partnership ordinarily acts through one of the individuals composing it; and therefore the law of agency, of which the law of partnership is said to be a branch, mainly, although not exclusively, governs the principles on which a partner acts for and binds his co-partners in dealings with third persons. A partnership is, in effect, a contract of mutual agency, each partner acting as a principal in his own behalf and as agent for his co-partners; the functions, duties, rights, and liabilities of the partners in a great measure comprehend those of agents, and the general rules of law applicable to agents apply with equal force in determining the rights and liabilities of partners. The basis of the liability of the partners is the fact that they are principals in any and every transaction, and not because they are credited or held out as partners." A person not a partner in fact

may be liable as such to third persons, upon the ground that he held himself out to the world as such, or has permitted others to do so, and is therefore estopped from denying that he is one, as against those who have in good faith dealt with the firm, or with him as a member of it. But it must appear that the person dealing with the firm believed and had a reasonable right to believe that the party he seeks to hold as a partner was a member of the firm, and that the credit was to some extent induced by this belief, and the holding out must have been by the authority or with the knowledge of the party sought to be charged. Whether the defendants in this case held themselves out as members of the firm of S. Brocato & Son, or permitted it to be done, is a question of fact and not of law. *Fletcher v. Pullen*, 70 Md. 205, 16 A. 887. In *Waring v. Nat. Marine Bank,* 74 Md. 278, 22 A. 140, in passing upon the question of partnership, it was said: "Persons by their conduct and course of dealing may be held liable as partners to third parties dealing with them, even though there was in fact no agreement of partnership." *Southern Can Co. v. Sayler,* 152 Md. 303, 136 A. 624.

The defendant Santa Brocato's first prayer is as follows: "The defendant, Santa Brocato, prays the Court to instruct itself sitting as a jury that if it finds from the evidence that the plaintiff, Charles Serio, loaned the sum of $2,000 to her father-in-law, and that her father-in-law died without repaying the loan to the said plaintiff, and further, that the said deceased did not leave any estate or property, and if it further finds that, after the death of said deceased, the said plaintiff obtained a note from the said Santa Brocato in the sum of $2,000 on the plaintiff's promise not to bring suit against the said decedent or cause any trouble, and that in consideration of the plaintiff's promise, the defendant, Santa Brocato, promised to pay the plaintiff the sum of $2,000 and that there were no other considerations for said note, then its verdict should be for the defendant, Santa Brocato."

This prayer, and the first prayer of the defendant Frank Brocato, are similar in every respect, except as to the necessary change of the names and relationship of the parties, and will therefore be discussed and disposed of together. It is apparent from an analysis of the evidence in this case that there is nothing found therein upon which the defendants can predicate the theory that the note referred to was obtained upon any promise of the plaintiff, or any one on his behalf, "not to bring suit against the said decedent or cause any trouble," and that because of this promise the note was executed. For this reason alone, the lower court was justified in rejecting both prayers. 2 *Poe, Pl. & Pr.*, sec. 299.

The second proposition sought to be submitted in these prayers is that of failure of consideration for the note referred to therein; and this part of the prayers, we think, is also erroneous, because it totally fails to submit to the jury the question of partnership, and the corresponding liability, as principals, of the makers of the note, under some circumstances at least, if the court, sitting as a jury, found the evidence sufficient to establish partnership, and that the purpose for which the note was issued was a partnership transaction.

The remaining prayer of Santa Brocato is in form substantially a duplication of her first prayer, and for that reason is subject to the same criticism.

It follows, therefore, that the judgment below will be affirmed.

*Judgment affirmed, with costs to the appellee.*