EAST COAST FREIGHT LINES, INC. ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE
SAME *v.* STATE, USE OF GRETSINGER ET AL.

[No. 96, October Term, 1947.]

258

259

260

*Decided April 1, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Wendell D. Allen* and *Francis B. Burch* for the appellant, East Coast Freight Lines, Inc.

*Wm. H. Maynard,* with whom was *Walter E. Morris* on the brief, for the appellant, State, use of Gretsinger.

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellant, State, use of Schoblocher.

*Lester H. Crowther* and *Richard M. Carlin, Assistant City Solicitors,* with whom was *Simon E. Sobeloff, City Solicitor,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

These cases involve appeals in suits against the Mayor and City Council of Baltimore, (the City), where demurrer prayers of the City were granted and judgments entered in its favor. The appeals are taken by East Coast Freight Lines, Incorporated (East Coast); State of Maryland to the Use of Maxine M. Gretsinger, Widow, *et al.;* State of Maryland to the Use of Anna S. Schoblocher, (now Amstutz), *et al.* East Coast also appeals from the refusal of the trial judge to grant a directed verdict for East Coast in the suit against it by State of Maryland to the Use of Maxine M. Gretsinger, Widow,

*et al.*, resulting in a judgment in favor of the Gretsingers. Where demurrer prayers are granted we must state the facts in a manner most favorable to those against whom the rulings were made.

Peter T. Schoblocher leased the tractor-trailer owned by him to East Coast under a leasing agreement which began at one o'clock P. M. on July 26, 1945, and expired at six o'clock P. M. on July 28, 1945. The East Coast had authorization from the Interstate Commerce Commission for the transportation of cargoes over Routes 1 and 40 through Baltimore City. Its usual route was on Route 1 to and through Baltimore in order to go by the East Coast Terminal, which was at Albemarle and Granby Streets.

Schoblocher operating the truck for the East Coast had made approximately thirty-five trips for East Coast from Richmond to New York City and return. The first trip was on February 3, 1945. Prior to July 26, 1945, when the accident happened, the last trip was on June 21, 1945. He made no trips between June 21, 1945, and July 26, 1945.

Schoblocher left Richmond, Virginia, about six o'clock P. M. on July 26, 1945, for New York City operating his tractor-trailer, leased to East Coast with a load of about 21,000 pounds which consisted largely of cellophane and seventeen drums of sizing in bulk. About one o'clock A. M. on July 27, 1945, the weather being rainy and drizzling and the night dark, he was driving on Washington Boulevard in Baltimore City. In the tractor-trailer with him was one Vernon M. Gretsinger, a member of the Armed Forces, who got in the tractor-trailer somewhere between Richmond and Baltimore. When Schoblocher reached Caton Avenue, according to the testimony of Roland Shaw, who was operating his own truck and flat trailer immediately ahead of Schoblocher, there was a detour sign which read: "Use Wilkens Avenue". The detour sign was placed there because a bridge on Washington Boulevard was officially closed to traffic beginning on July 5, 1945, to divert traffic and

send it north on Caton Avenue. Schoblocher at the detour sign, stopped a few moments and turned on Caton Avenue and proceeded north to Wilkens Avenue. He turned and proceeded east on Wilkens Avenue.

Wilkens Avenue is a public highway of Baltimore City and east from Caton Avenue was 54'2" wide from curb to curb and gradually widened to 60'1" in width until it intersected with an alley. At the point where it became 60'1" in width between curbs there was a grass plot in the center approximately 5'11" wide. The grass plot was surrounded by a concrete curb of from 4½" to 5" high. Each lane of Wilkens Avenue, where the grass plot was located in the center, was 27'1" in width. The surface of the bed of Wilkens Avenue was covered with black material and the curbs were constructed of reinforced concrete of a whitish or grayish color. Inside the grass plot at a point about three feet from its west end and in the center thereof was erected a metal lamp post about sixteen feet in height attached to a heavy concrete base. From this first lamp post east the same type of metal lamp post was spaced at regular intervals of about 130' apart to the end of the center plot at Bentalou Street, a distance of five or six blocks. The grass on the plot was green and the metal pole was painted green. There is evidence that at the time of the accident in this case there were no warning signs, shields, barriers, or any other warning device at the west end of the grass plot or on the lamp post erected within three feet from where the grass plot started. There had been storms of extreme intensity in Baltimore City that evening. The Consolidated Gas, Electric Light and Power Company of Baltimore City (Gas Company), who contracted with the City to maintain service on the lights in the grass plot, had 373 cases of trouble in the City and vicinity that evening. At about 9:52 P. M. on that night, (July 26, 1945), all of the lights along Wilkens Avenue, including that on the first lamp post at the west end of the center plot, had gone out on account of the storm. At 12:58 A. M. on July 27, 1945, Balder-

son, a service man in the employ of the Gas Company, was sent out to repair the lights on the poles in the grass plot on Wilkens Avenue. He parked his truck on the south side of Wilkens Avenue and entered a saloon on the corner and was in the process of calling the Gas Company for the purpose of requesting a low power test on the circuit when the accident happened. The lights were not on at the time of the accident. Beginning at the westerly end of the grass plot at the north and south edges thereof, were painted two white lines forming a V which ran westerly for a distance of about thirty-two feet. This V had been repainted and replaced in May, 1945. From Caton Avenue to the point forming the V was a white painted line in the center of Wilkens Avenue which had been repainted on July 26, 1945. The plans and specifications of the grass plot in the center of Wilkens Avenue were approved by the State Roads Commission, the City of Baltimore, and the Public Works Administration of the Federal Government. After the completion of the work there was a joint inspection by the State Roads Commission and the Highway Department of Baltimore City and the work was approved.

Roland Shaw testified further that he could see the headlights and clearance lights of the East Coast truck in his rear view mirror. East Coast truck was not going over twenty-five to thirty miles an hour. Shaw said that immediately before the accident the East Coast truck was right in the middle of the street which was soaking wet and he could not see any lines in the street. He had been using the Wilkens Avenue detour for approximately six or seven weeks. He could see the East Coast's lights just about in the middle of the right hand lane. He did not see any warning signs on the pole the night of the accident. Shaw further said that the East Coast truck was right behind him and in the middle of the right hand lane, "a little out from me which would put him in the middle of the street." The East Coast truck was not on the wrong side of the street. When he approached the grass plot in Wilkens Avenue, he

pulled to the right to go around it but the East Coast truck did not pull to the right. He could see the lights of the East Coast truck and the truck was a little bit off to one side of him. He was watching in the mirror to see if "he did pull in and he did not." He saw East Coast's lights jump up in the air which meant he hit the grass plot and a fraction of a second later there was a terrific explosion. Shaw was about three hundred feet east of the west end of the grass plot when the accident happened. Shaw then seeing the accident, stopped his truck and went back to look at the grass plot, the scene of the accident. He could see where the truck had hit the grass plot by the marks on the road which showed that the left wheel had hit the curb first.

. Mr. Jesse J. Hyatt testified that he traveled Wilkens Avenue twice a day and was following the East Coast truck at the time of the accident and was about two truck lengths behind it. East Coast truck "hung to" the middle of the road all the way in Wilkens Avenue. Hyatt stayed back because he figured East Coast truck would have to pull over where the street narrowed. When he saw East Coast truck was not going to pull over he stayed much behind it. The East Coast truck hit the curb, then hit the lamp post, "jack-knifed", and shot across the grass plot.

Another tractor-trailer owned by Elmer D. Willis and operated by Lorenzo Lewis, Sr. was proceeding westerly along Wilkens Avenue. The East Coast truck continuing across the grass plot to the west bound lane collided with the Lewis tractor-trailer. A fire then resulted. Schoblocher and Gretsinger on the East Coast truck were killed. Lewis died as a result of the accident and Brady Gillikin, who was riding with Lewis, was injured.

Mr. M. H. Pisani, Assistant to the Superintendent of the Electric Distribution Department of the Gas Company, testified that the Gas Company had notified the City of seventeen previous accidents at this west end of the grass plot on Wilkens Avenue at night when the light pole was damaged.

Walter T. Tome testified that he was head of street lighting in Baltimore City in 1945 with the title of Junior Associate Engineer. He did not himself decide where a light pole was to be placed but made recommendations to the Mechanical-Electrical Engineer. He had been with Baltimore City for thirty-one years in the Lighting Division and he was familiar with all the work pertaining to street lights. He said that the City had received notices from the Gas Company of damaged electric light street lamps. At the west end of the grass plot on Wilkens Avenue damages had been reported to the street lamp on eighteen previous occasions. Those reports were received from one to five days after repairs were made. Those reports did not give any particulars surrounding the damaging of the pole, did not show whether the damage was caused by motor vehicles but merely showed that the pole was damaged and repaired. He testified further that the Mechanical-Electrical Engineer of Baltimore City designated the color of the electric light poles. The court properly excluded a proffer made by East Coast of testimony from Mr. Tome that the lamp post at the west end of the grass plot on Wilkens Avenue was designated as a dangerous pole by his department. This evidence was properly excluded because the testimony of the witness did not support the proffer. The court also properly excluded testimony of this witness that it was the practice of the City to put a red warning sign at the head of center parkways in the City to show where they begin, and also why this particular pole was not striped. This evidence was properly excluded as the witness's duty was confined to the street lighting of Baltimore City and he could hardly be qualified to state a practice of the City in regard to placing warning signs and the color of the poles.

East Coast endeavored to offer in evidence the manual of Traffic Control Devices issued by the State Roads Commission of Maryland. Under the provisions of Chapter 1007 of the Acts of 1943, Code (1943 Supplement), Article 66½, Sections 137, 138, and 139, the State Roads

Commission was ordered to adopt a manual and specifications for a uniform system of traffic control devices upon highways in the state and was directed to place and maintain such traffic control devices conforming to its manual. The Act further provides that all such traffic control devices hereafter erected shall conform to the state manual and specifications. Mr. Ezra B. Whitman, Chairman of the State Roads Commission, through 1944, said there were a great many regulations which would apply in the country that would not apply in the City. He said he believed the manual was sent to the twenty-three counties and Baltimore City. After the manual was distributed there was no general replacement of old traffic control devices by conforming to the manual with new traffic devices. The manual applied to new signs erected after 1943. Mr. Whitman further stated that there was still a great diversity in Maryland in 1945 as to signs and there was not any general replacement of old traffic control devices with new ones. We agree with the trial judge that under this testimony, the State Roads Commission's Manual was properly excluded from evidence in these cases.

Suits were originally filed against East Coast only, by Elmer D. Willis, *et al.*, the owner of the tractor-trailer; by the State of Maryland to the Use of Eunice Lewis, Widow, *et al.*; State of Maryland to the Use of Maxine M. Gretsinger, Widow, *et al.*; and by Brady Gillikin. After the filing of the original declarations, East Coast filed Third Party Complaints against the Gas Company and the City. The Gas Company and the City demurred to the Third Party Complaints. The demurrers of the Gas Company were sustained while those of the City were overruled. On appeal to this Court the sustaining of the demurrers of the Gas Company were affirmed on December 13, 1946, in the case of *East Coast Freight Lines, Inc. v. Consolidated Gas, Electric Light & Power Co.*, 187 Md. 385, 50 A. 2d 246.

East Coast then amended its Third Party Complaints by striking out the Gas Company as a Third Party De-

fendant. Subsequently, the plaintiffs in each of the aforesaid original cases filed amended declarations naming as original defendants, East Coast and Mayor & City Council of Baltimore, (the City). After the sustaining of the "B" and "C" demurrer prayers of the City in the · cases of Willis, Lewis, Gretsinger, and Gillikin, *supra*, those four cases went to the jury against the defendant, East Coast, and verdicts were returned in favor of three plaintiffs as follows: State of Maryland to the Use of Eunice Lewis, Widow, and children, $25,000.00; Brady Gillikin, $36,000.00; Elmer D. Willis, *et al.*, $3,982.42. Motions for new trials were denied and judgments in the respective amounts entered against East Coast. Afterwards a settlement of these three judgments was effected by East Coast paying to Brady Gillikin, $28,000.00; to Eunice Lewis, Widow, and children, $22,000.00; and to Elmer D. Willis *et al.*, $3,500.00. East Coast simultaneously received from these three plaintiffs joint tortfeasor releases, each of these releases intending to reserve unto East Coast its rights and claims for contributions against the City as a joint tortfeasor. The judgments totaling $64,982.42 having been settled for $53,500.00, the claim of East Coast for contribution against the City as joint tortfeasor extends to one half of $53,500.00.

In the Gretsinger case the Court reserved its ruling on the East Coast's motion for a directed verdict and a verdict was returned against East Coast in the amount of $10,000.00. A motion for judgment *non obstante veredicto* (N. O. V.), was denied in favor of East Coast, leaving the judgment in the amount of $10,000.00 against East Coast.

A suit was also entered, State of Maryland to the Use of Anna S. Schoblocher (now Amstutz), surviving widow of Peter T. Schoblocher, against the Gas Company and the City, but not against East Coast. The demurrer of the Gas Company was sustained. *East Coast Freight Lines, Inc., v. Consolidated Gas, Electric Light & Power Co., supra.* The Schoblocher case was tried, and in con-

junction with the Willis case, the Lewis case, the Gretsinger case, the Gillikin case, the demurrer prayers, "B" and "C", *supra,* of the City having been granted in all of those cases, a judgment was entered for the City in the Schoblocher case for costs. From that judgment an appeal is taken to this Court in the Schoblocher case against the City alone.

Appeals are taken against Baltimore City in the granting of the "B" and "C" demurrer prayers and judgment in favor of the City by East Coast, Gretsinger, and Schoblocher, now Amstutz. An appeal is taken by East Coast on the refusal of its demurrer prayer against Gretsingers in that case and from the judgment in favor of Gretsingers.

We will first consider the action of the trial court in granting the "B" and "C" prayers of the City taking the cases of Gretsinger, Schoblocher, Willis, Lewis, and Gillikin from the jury as to the City. Those prayers follow:

### "B Prayer

The Court instructs the Jury that there is no evidence in this case legally sufficient to prove that any negligence on the part of the Mayor and City Council of Baltimore caused or contributed to the happening of the accident mentioned in the testimony, and the verdict of the Jury must, therefore, be for the Defendant, the Mayor and City Council of Baltimore.

### C Prayer

The Court instructs the Jury that there is no evidence in this case legally sufficient to show that the Defendant, the Mayor and City Council of Baltimore, was guilty of negligence causing or contributing to the happening of the accident mentioned in the evidence by (1) maintaining a dangerous obstruction, public hazard and nuisance in the bed of Wilkens Avenue, (2) in failing to mark the center grass plot mentioned in the evidence with warning signs, shields, barriers or other devices to warn east bound traffic of the presence of said center plot,

or (3) in failing to restore the lights mentioned in the evidence prior to the accident mentioned in the evidence, and therefore, under the pleadings in this case the verdict of the Jury must be for the defendant, the Mayor and City Council of Baltimore."

The primary question for our decision is whether, the City having established a grass plot in the center of the highway, Wilkens Avenue, there was sufficient evidence to present to the jury the question as to whether the City was negligent in not providing adequate warnings, at the beginning of the grass plot, to the East Coast truck on this dark, rainy night when there was evidence that the marks on the road were not visible to the driver of the truck approaching it for the first time.

Viewing the evidence hereinbefore set forth in a light most favorable to the plaintiffs, there was evidence from which the jury might fairly infer that this was the first time that Schoblocher had ever traveled on Wilkens Avenue from the fact that East Coast's route was Route 1 and Wilkens Avenue was the Alternate Route 1. Route 1 on Washington Boulevard was closed to traffic on July 5, 1945, and Schoblocher, up until the night of the accident, had not been over the route since Washington Boulevard was closed. The jury might also fairly infer from the testimony of Shaw that Schoblocher was on the right side of the street in the right lane as he approached the grass plot. Shaw, who was familiar with the street, could not see any lines in the streets, which were soaking wet. The jury might also fairly infer that if Shaw, who was familiar with Wilkens Avenue, could not see the lines in the street, that Schoblocher could not see them on account of the rain. There was creditable evidence that there were no warning signs on the pole or on the grass plot placed in the middle of the highway, Wilkens Avenue, on the night of the accident. As Schoblocher approached the grass plot his left front wheel hit the curb of the grass plot and the tractor-trailer proceeded directly across it into the west bound lane of

Wilkens Avenue. The time was one o'clock A. M. There was a drizzle and light rain, the night was dark and all the lights along Wilkens Avenue were out.

It has been frequently stated by this Court that a case should not be taken from the jury on the ground of total failure of evidence if there is any evidence, however slight, legally sufficient and tending to prove the claim. Before granting a prayer for a directed verdict the court must assume the truth of all the evidence tending to sustain the suit and of all inferences of fact fairly deducible therefrom, even though such evidence may be contradicted in every particular by the opposing evidence in the case. *Brocato v. Serio,* 173 Md. 374, 381, 196 A. 125; *Atholwood Development Co. v. Houston,* 179 Md. 441, 19 A. 2d 706; *Henkelmann v. Metropolitan Life Insurance Co.,* 180 Md. 591, 595, 26 A. 2d 418.

The City contends that it is not its duty to put up warning signs to control traffic in Baltimore City, that this is the duty of the police department, which is not a party to these cases. It relies strongly on the case of *Green v. Baltimore,* 181 Md. 372, 30 A. 2d 261. It was pointed out in that case at pages 374 and 375 of 181 Md., at page 261 of 30 A. 2d: "The Act of 1867, Ch. 367, took the Police Department out of the hands of the city, and put it in the control of the State. By section 899 of the City Charter (1938 Ed.); Public Local Laws (1930), Art. 4, sec. 747, it is the duty of the Police Commissioner, who is appointed by the Governor, 'to estimate annually what sum of money will be necessary for each current fiscal year to enable him to discharge the duty imposed on him, and he shall forthwith certify the same to the Mayor and City Council of Baltimore, who are required without delay, specifically to assess and levy such amount as shall be sufficient to raise the same clear of all expenses and discounts upon all the assessable property in the City of Baltimore, and cause the same to be collected as all other city taxes'; and, if the amount so estimated shall prove insufficient, he may issue certificates of indebtedness against the city to make up the

deficiency not to exceed fifty thousands dollars in any one year."

"The power to pass ordinances and make traffic regulations is in the Mayor and City Council; but the enforcement of them is the duty of the police. *State v. Stewart,* 152 Md. 419, 137 A. 39. As said in *Altvater v. Baltimore,* 31 Md. 462, 466, the first case to come to this court after the adoption of the Act of 1867, 'Whilst it is the duty of the Mayor and City Council of Baltimore, to pass all proper ordinances authorized by their charter in regard "to the prevention and removal of nuisances," * * * they are deprived of the power of enforcing them.' See also *Sinclair v. Baltimore,* 59 Md. 592; *Taxicab Co. v. City of Baltimore,* 118 Md. 359, 84 A. 548. The city cannot be held responsible unless it produced the condition in the streets resulting in injury. *Gutowski v. Baltimore,* 127 Md. 502, 96 A. 630." In that case, *Green v. Baltimore, supra,* Sarah Green was injured when the automobile in which she was riding ran into an unlighted pylon on North Avenue about six o'clock on a rainy, dark, and foggy evening when she could not see. The evidence in the case showed that the pylon was installed, wired, and serviced by the Police Department. This Court held in that case that, if there was negligence in the case, it was the negligence of the Police Department and the judgment in favor of the Mayor and City Council of Baltimore was affirmed. In that case the statement was made at page 376 of 181 Md., at page 262 of 30 A. 2d: "The City and the Railway Company construct the pylons and provide the safety zones, and thereafter they are in charge of the Police Department." The uncontradicted evidence in that case showed that the United Railway and Electric Company, the predecessor of the Baltimore Transit Company, installed the concrete platform and the Police Department and not the City installed the pylon. The evidence in the case showed that the Police Department and not the City authorized, located, designed, constructed, and maintained the safety zone and pylon. The City did not place the obstruction in the

street. By the sentence above quoted from that case, what was meant was that the City and the Railway Company shared the cost of the construction of the pylons and safety zones, the City paying through its annual appropriation to the Police Department. That Department having constructed the pylon and having failed to keep it lighted the City was not liable. This is clear from the above quoted sentence: "The city cannot be held responsible unless it produced the condition in the streets resulting in injury."

The case at bar is not similar to the following cases: *Altvater v. Baltimore,* 31 Md. 462, where a pedestrian was injured by a sled coasting in the street and where it was the duty of the Police Department to enforce an ordinance preventing such occurrences; *Sinclair v. Baltimore,* 59 Md. 592, where a pile of building material was allowed to remain in the street in the course of the erection of a building, the City not being responsible for the material being in the street; *Taxicab Company v. Baltimore,* 118 Md. 359, 84 A. 548, where a contractor had left a quantity of building material in the street at night; *Gutowski v. Baltimore,* 127 Md. 502, 96 A. 630, where the City was sued for non-enforcement of an ordinance; *State v. Stewart,* 152 Md. 419, 137 A. 39, which involved the enforcement of traffic regulations in Baltimore. In *Charles v. Baltimore,* 138 Md. 523, 114 A. 565, relied on by the appellee, where the driver of an automobile collided with a concrete division wall separating the driveway of a bridge on Poplar Grove Avenue in Baltimore into two ways and where the light ordinarily lighted was out at the time of the accident, the court there, by implication, recognized the duty imposed upon the City of lighting the bridge. See *Baltimore v. Thompson,* 171 Md. 460, 471, 189 A. 822. The City also relies strongly on the case of *Cumberland v. Turney,* 177 Md. 292, 9 A. 2d 561. In that case the plans for the construction of the street where the accident happened were approved by competent and skilled experts, just as the construction of the grass plot in the instant case was approved

by skilled and competent engineers. However, in that case this Court specifically found, at page 320, of 177 Md., at page 571 of 9 A. 2d, that traffic signs were erected which were there to be seen and plainly visible had the driver of the automobile looked. In the instant case, the jury might fairly find that there were no warning signs.

The case at bar is in line with *Baltimore v. State, for of Use of Cirtout,* 146 Md. 440, 126 A. 130, where the City had paved a part of a public street, then, without lights, barriers, or warnings, permitted the remainder of the street to remain unpaved and terminate in an abrupt declivity; *Baltimore v. O'Donnell,* 53 Md. 110, 36 Am. Rep. 395, where the City employed a contractor to repave a city street and the contractor stretched a rope across it to prevent travel thereon because it was impassable and someone ran into the unlighted rope; *Baltimore v. Walker,* 98 Md. 637, 57 A. 4, where a pedestrian fell over a stop-box installed by the City and which projected two or three feet above the pavement; *Annapolis v. Stallings,* 125 Md. 343, 93 A. 974, where the City permitted a hole to remain in the sidewalk for an extended time and plaintiff fell in it; *Baltimore v. Biggs,* 129 Md. 686, 99 A. 860, where an automobile ran off the public street into the water, the termination of the street not being indicated in any fashion; *Baltimore v. Bassett,* 132 Md. 427, 104 A. 39, where the plaintiff attempted to board a streetcar at a proper streetcar stop and stepped into a hole three or four feet in diameter which the City had permitted to remain there for a number of months; *Cordish v. Bloom,* 138 Md. 81, 113 A. 578, where the plaintiff fell as a result of a defective sidewalk condition which had been permitted to remain for sometime; *County Commissioners of Kent County v. Pardee,* 151 Md. 68, 134 A. 33, where the plaintiff was riding in an automobile which ran over a deep rut filled with water accumulated from ditches on the side of the road. In the case of *McCarthy v. Clark,* 115 Md. 454, 81 A. 12, where a contractor had left an

iron manhole frame on the sidewalk at night while performing work for the City, the City in that case claimed that it was not liable becauase the omission to remove or guard the obstruction was vested in the Police Department over which the City had no control. This Court in that case said at page 458 of 115 Md., at page 14 of 81 A.: "Whether this principle would be applicable under the existing provisions of the City Charter and the decisions of this Court in *Baltimore City v. Beck*, 96 Md. [183] 191, 53 A. 976, and *Baltimore City v. Walker*, 98 Md. 637, 57 A. 4, it is not necessary for us to determine, because it is obvious that such a doctrine could not be applied to a case in which the municipality was itself instrumental in creating the occasion for the obstruction and because upon the facts now before us we are of the opinion that the city must be held to sustain such a relation to the cause of the accident."

The facts in the cases before us here are remarkably similar to those in the case of the *Mayor and City Council of Baltimore v. Thompson*, 171 Md. 460, 189 A. 822, 825. In that case at about eight or eight-thirty o'clock on the evening of January 21, 1935, Harry C. Thompson, accompanied by his wife, Hedwig Thompson, the appellee in that case, was driving his automobile west on Eager Street and approaching the bridge on that street from the direction of Greenmount Avenue. One of three girders was located on each side of the bridge at the edge of that part of the street used for vehicular traffic, and the other girder was in the center of the street dividing it on the bridge into two driveways, one for east and the other for west bound traffic. The center girder was about seventy-six feet long, five feet high, twenty inches wide and the concrete of grayish black color. Each driveway was about eighteen feet wide and paved with sheet asphalt. Lights were provided on each side of the bridge and at other places in the near vicinity. The night was foggy, the visibility was poor. As Thompson attempted to cross the bridge he collided with the east end of the center girder and Mrs. Thompson suffered

severe injuries. Thompson said that there were no lights on the girder itself and that he saw "no markings" on it. He was not familiar with Eager Street. Mrs. Thompson said at the time of the collision the headlights on the automobile were burning, there were no markings and no black and white stripes on the end of the girder. The bridge was built by the Pennsylvania Railroad Company under the authority of certain ordinances of the Mayor and City Council of Baltimore. The girder was necessary to support the bridge. This Court there found that, while the girder was not a nuisance and was a necessary part of the bridge, nevertheless it was an obstruction to the free flow of traffic along Eager Street, which, under the weather conditions existing at the time of the accident, might well be dangerous to automobile traffic over the bridge. Other than the lights on either side of the street the municipality had provided no light, marking, or other device to aid travelers on the highway to locate it under the weather conditions existing at that point at the time of the accident. This Court pointed out in that case that it is the duty of the municipality to exercise reasonable care to keep its public highways safe for public travel. It is well settled that it is not an insurer of the safety of persons in the lawful use of such highways, but is only liable for a failure to use reasonable care to so maintain them that travelers thereon in the exercise of reasonable care at night or in the day may not be subjected to any dangers arising from defects in the construction, upkeep, or maintenance of such highways under reasonably foreseeable conditions of weather or traffic. The municipality may therefore be liable for injuries caused by an obstruction in a public highway of which it had sufficient notice, even though the obstruction is authorized by proper municipal and legislative authorities, where it is reasonably foreseeable that it will endanger persons using the highway while in the exercise of reasonable care unless it takes the precaution of warning such persons of the danger by some reasonably adequate means. "Such a liability does not arise from any failure

of a general duty to light the highways, but from a failure to exercise reasonable care to guard the traveling public against some special condition of which the municipality had sufficient notice which an ordinarily prudent person might reasonably anticipate would endanger travelers on the highway while in the exercise of reasonable care. 29 *C. J.* 688. The basis of that liability is the duty resting upon the municipality of keeping the highways safe for travel over them. That duty is not discharged if the highways are permitted to be or remain in such a condition that persons in the lawful use of them may be imperiled by unknown dangers which they could not by the exercise of reasonable and ordinary care anticipate or avoid." Judge Offutt, who wrote the opinion in that case, cited therein many cases to support these principles.

Turning to the facts in the case at bar, it is apparent that while the grass plot was not a nuisance, nevertheless it was an obstruction to the free flow of traffic along Wilkens Avenue, which, under the weather conditions existing at the time of this accident, might well be dangerous to vehicles approaching this grass plot from the west. Other than the lights on the lamp posts and markings on the street, the City had provided no other device to aid travelers on the highway to locate the grass plot in the center of the highway under the weather conditions existing at that point at the time of the accident. There was testimony that on account of the storm the lights were out and the markings on the street were not seen. It appears that the grass plot in the center of Wilkens Avenue was erected during the years 1937 and 1938 and since that time there had been seventeen collisions at night with the lamp post located within three feet of the west end of the grass plot. Storms such as that on the evening of July 26, 1945, are more or less common in the summertime. It seems obvious that a green lamp post in a green grass plot surrounded by a curb, in the center of an otherwise open and unobstructed highway, is an obstruction which, under conditions which existed on the night of the accident, may have, because

its color blended with the surroundings, constituted such a threat to the safety of the traveling public as to place the City under a duty to provide means of warning travelers on Wilkens Avenue of the location of the grass plot. It appears that the City was under a legal duty to anticipate the occurrence of such weather conditions as existed at the time of the accident in this case. That such storms do occur in Baltimore City in the summer with sufficient frequency to justify a reasonable expectation that they will from time to time recur, is a matter of common knowledge. Therefore the City should have anticipated their occurrence and have placed such warning devices, which under storm conditions, would have permitted a traveler approaching the grass plot to have discovered its location in time to avoid colliding with it. The City approved the plans for the construction of the grass plot and was charged with the knowledge of weather conditions common to all residents of the City. This Court is therefore of opinion that there was sufficient evidence to submit to the jury the question whether the City, in constructing this grass plot with a concrete curb in the center of the highway, was negligent in failing to place warning devices sufficient to warn east bound traffic of the presence of this center plot and therefore that the demurrer prayers should not have been granted as to the Mayor and City Council of Baltimore City. Therefore, new trials will be granted against the City in the Gretsinger, Schoblocher, Willlis, Lewis, and Gillikin cases.

As to the question of contributory negligence on the part of Schoblocher, in the Schoblocher case against City, there is nothing in the record to show that a prayer on the question of Schoblocher's contributory negligence was presented to the trial judge. From the evidence before us we could not hold that Schoblocher was guilty of contributory negligence as a matter of law.

The Lewis, Gillikin, and Willis cases were tried before our new rules with respect to joint tortfeasors went into effect. These rules are applicable, except by agreement, only to those cases instituted after January 1, 1948. What

we shall hereafter say is not to be construed as an interpretation of these new rules.

Chapter 344 of the Acts of 1941, Code (1943 Supplement), Article 50, Sections 21 to 30 inclusive, establishes the right of contribution among joint tortfeasors and sets forth third party procedure and practice. The amended declarations here joined the City as a defendant and we find that the trial court erred in directing a verdict for the City in those cases. This leaves East Coast in the position where it has paid the judgments and might be compelled to try the cases in their entirety against the City. The purpose of the joint tortfeasors act is designed to prevent a multiplicity of suits. Article 50, Section 27(c), *supra,* provides in part: "(c) A pleader may * * * (b) move for a judgment for a contribution against any other joint judgment debtor, where in a single action a judgment has been entered against joint tortfeasors one of whom has discharged the judgment by payment or has paid more than his pro rata share thereof. If relief can be obtained as provided in this sub-section no independent action shall be maintained to enforce the claim for contribution." By Article 50, Section 27(d), the court may render such judgment as may be suitable under the provision of the joint tortfeasors act. By Rule 7, Special Verdicts, General Rules of Practice and Procedure, Code (1947 Supplement, page 2052), the court is given authority to submit issues of fact to the jury and the court is authorized to enter the appropriate judgment on those findings.

In the Lewis, Gillikin, and Willis cases the court should submit to the jury Issue 1. "Was the City guilty of any negligence directly contributing to the accident? Answer:———." If the answer is "Yes" to Issue 1, the previous jury having settled the amount of damages in the Gillikin case, the trial court should then enter judgment by way of contribution in favor of East Coast against the City for $14,000.00, under Trial Rule 7, and Article 50, Sections 24, 27(c) and 27(d), *supra,* being one-half of the $28,000.00 which East Coast paid in that

case. In the Willis case the court should then enter judgment by way of contribution in favor of East Coast against the City for $1,750.00, being one-half of $3,-500.00, which East Coast paid that plaintiff. In the Lewis case, the court should then enter a judgment by way of contribution in favor of East Coast in the amount of $11,000.00, being one-half of the $22,000.00 which East Coast paid in that case.

The judgment in the case of State of Maryland to the Use of Maxine M. Gretsinger, Widow, *et al.*, against East Coast, in the amount of $10,000.00 was allocated as follows: $2,500.00 to Maxine M. Gretsinger, widow; $3,-750.00 to Vernon Harold Gretsinger, son; and $3,750.00 to William Clayton Gretsinger, son. A motion for a directed verdict was filed on behalf of East Coast in that case. The trial judge reserved the ruling on that motion. After the verdict was returned the Court denied East Coast's motion for a judgment N. O. V. and entered judgment in favor of the Gretsingers, *supra,* plaintiffs. From that judgment, East Coast appeals.

In addition to the facts hereinbefore recited, Shearer C. Bowman, the Manager of Operations for East Coast, testified that when Schoblocher was employed by them in February, 1945, he was asked whether he was familiar with the Interstate Commerce Commission's rules and regulations and he stated that he-was familiar with such rules and regulations. Rule 2.36 of the Interstate Commerce Commission was offered in evidence which provided that transportation of hitchhikers and other unauthorized persons was prohibited on property-carrying vehicles. No person other than employees could be transported on such vehicles unless specifically authorized in writing by the motor carrier. Nothing in this rule could be construed to prohibit the carrying of any person in case of an accident or in other emergencies. This rule did not apply to farmers in the transportation of agricultural commodities or supplies to the farm. Mr. Bowman said that Gretsinger was not an employee of East Coast and East Coast did not authorize Schoblocher

to carry passengers. He did not know how Gretsinger got on the truck as a passenger. He knew nothing about Gretsinger until after the accident. He further stated that East Coast had a set of rules which was posted on the bulletin board of the company and which was accessible to all drivers on all leased equipment. These rules were offered in evidence. He testified that he personally never specifically referred to the regulations about no riders in conversation with Schoblocher, but that on one occasion Schoblocher wanted to ride on one of the East Coast trucks from New York to Richmond as a passenger and he was not allowed to do so. He further stated that all drivers under Interstate Commerce Commission license, which Schoblocher had, must have an Interstate Commerce examination. Schoblocher had a slight limp. Bowman said that the company required a driver to have a helper only if there was a limitation in the time allowed him to get to New York, but if there was no limitation of time for arrival in New York and the load was not "Rush", a helper was not required. He said there was no specific time when Schoblocher was to arrive in New York on the trip when the accident happened. He did not know whether Schoblocher had a helper on that trip but it was a "slow load" and there was no hurry at all in the arrival at New York. The drivers were to drive only eight hours at a time and were to sleep in the sleeper cabs at their discretion. The trip from Richmond to New York normally consumed between twelve and fourteen hours. He further stated that Schoblocher was under the control of East Coast on the trip when the accident happened. He had no way of knowing whether Schoblocher had asked Gretsinger to act as his helper on this trip. He did not know where Schoblocher picked up Gretsinger but "it would most likely be some place along the highway." He said that Schoblocher could pick up a helper if he needed one, and usually when he got his helper he got him before leaving Richmond. Schoblocher was entitled to stop and sleep anytime on a trip that took more than ten hours. There

was no evidence showing that Schoblocher had any signs or lettering on the tractor-trailer prohibiting riders. Schoblocher, in the lease with East Coast, was required to pay the compensation "for one or more drivers as may be required."

Vernon C. Gretsinger, whose home was in Punxsutawney, Pa., and who was in the East Coast tractor-trailer and was killed at the time of the accident, was twenty-five years of age at the time of his death. Before becoming a member of the Army he worked for the Pennsylvania Railroad Company as a machinist and welder for a salary of about $300.00 a month. He entered the United States Army in 1944, serving both in this country and abroad. On his return to the United States he went to the Army hospital at Camp Pickett, Virginia, where he was being treated for shock. His wife said that he appeared well, better than any time in his life. Counsel for Gretsinger offered testimony that the day after Gretsinger's wife received a telegram notifying her of her husband's death as a result of the accident, her two children both received a card from which indicated that Vernon Gretsinger, the father and husband, was on his way home and intended to be there. Objection to the introduction of the two cards into evidence was made by the City and the objection was sustained. From the record it is impossible to tell whether the cards themselves were offered in evidence or their absence accounted for, and also whether the signature on the cards was proven. Under the circumstances we cannot say that the trial judge erred in refusing this testimony.

In the Gretsinger case four issues were submitted to the jury, out of those offered. These were: "1. Was Peter T. Schoblocher, driver of the East Coast tractor-trailer, guilty of any negligence contributing to the accident? 5. Was Vernon Gretsinger riding on the tractor-trailer owned by Peter T. Schoblocher and leased to East Coast Freight Lines, Inc. by permission of Peter T. Schoblocher? 6. Did Peter T. Schoblocher have apparent authority from East Coast Freight Lines, Inc. to permit

Vernon C. Gretsinger to ride on said tractor-trailer?" To these three issues the jury answered "Yes". The fourth issue was as to the amount of damages, which was awarded in the amount of $10,000.00 as aforesaid.

East Coast contends that the Sixth Issue, *supra*, should not have been submitted to the jury and we agree with its contention. As pointed out in the case of *Great A. & P. Co. v. Noppenberger,* 171 Md. 378, 189 A. 434, the doctrine of apparent authority is applicable only where the relation of employer and employee is that of principal and agent. Where the relationship between the employer and employee is that of master and servant and an attempt is made to hold the master liable for the tortious acts of the servant, the master is liable only for those acts of the servant which have been committed while in the exercise of those acts expressly or impliedly authorized by the master. A conventional agent is employed to represent a principal in relation to some contractual obligation with a third party, whereas the servant is employed to render service to rather than for the master, even though it may happen that the service will involve relations with third persons. Although both relations rest in contract, in measuring the extent of an agent's authority, emphasis is more often placed upon the terms of the contract rather than in the case of a servant where the emphasis is ordinarily placed upon the nature of the employment. The distinction is of importance here where the inquiry is directed to the liability of the master for the tortious acts of a servant. In the case of an agent that liability often depends upon the apparent authority of the agent because, since it is his function to create primary obligations giving rise to primary rights, the person with whom he deals representing his principal may justly complain if he is permitted by the principal to display an appearance of authority which has never in fact been granted him. In the case of a servant whose acts do not create, but violate, primary rights, and give rise to secondary obligations and remedial rights, appearances are of less importance because usually

the third party is not misled by the master's representations of the servant's authority. In such case the course of employment is said to be the basis of liability. The fact. that the servant is in the general employment of the master does not create an inference that a certain act done by him was in the scope of his employment. To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master. *Mechem on Agency*, Section 36; *Huffcut on Agency*, Section 5; *American Law Institute, Restatement, Agency*, Section 228, comment (b).

An act may be within the scope of the employment even though forbidden or done by one employed or procured by the servant to assist him, where there is either expressed or implied authority to employ assistants and such authority may be implied from the nature of the work and the general course of the master's business. 39 *C. J.* 1271; *Mechem on Agency*, sec. 1866 et seq.; *A. L. Institute, Restatement of Agency*, sec. 81; *Maryland Annotations, Restatement of Agency*, sec. 79-81.

The doctrine of *respondeat superior* arises from the principle that the liability of the master for the tortious acts of the servant rests upon the essential premises of authority expressed or implied. It therefore appears that the Sixth Issue on the question of apparent authority should not have been submitted to the jury in the case at bar.

The issue which should have been framed in such case was: "Did Peter T. Schoblocher have expressed or implied authority from East Coast Freight Lines, Inc. to permit Vernon C. Gretsinger to ride on said tractor-trailer?" Unless he did have such expressed or implied authority, Schoblocher was not acting within the scope of his employment when he permitted Gretsinger

to ride in the truck and therefore, East Coast was not liable.

The question next arises as to whether there was sufficient evidence to present this issue to the jury and therefore, whether a verdict should have been directed in favor of East Coast as contended by the appellant. There is no evidence in this case to show that Schoblocher picked up Gretsinger as a helper or driver. Nor is there any direct evidence to show that Gretsinger was picked up as a passenger, commonly known as a "hitch-hiker". No one knows why Gretsinger was on the tractor-trailer. The burden of proof is on the plaintiff to prove that Schoblocher had either expressed or implied authority to pick up Gretsinger and that he was picked up as a helper or as an extra driver. It is true, as contended by the appellant, and, as pointed out in the case of *Salowitch v. Kres,* 147 Md. 23, 28, 127 A. 643, that where the ownership of the vehicle causing the collision is in the defendant and the driver thereof is in the general employment of the defendant, there is a reasonable presumption that at the time of the accident the driver is the servant of the defendant and acting within the scope of his employment. *Vanderhorst Brewing Co. v. Amrhine,* 98 Md. 406, 56 A. 833; *Geiselman v. Schmidt,* 106 Md. 580, 68 A. 202; *Stewart Taxi-Service Co. v. Roy,* 127 Md. 70, 95 A. 1057; *Dearholt Motor Sales Co. v. Merritt,* 133 Md. 323, 105 A. 316; *Jordan Stabler Co. v. Tankersly,* 146 Md. 454, 126 A. 65; *Erdman v. Horkheimer & Co.,* 169 Md. 204, 181 A. 221. However, in the opinion of this Court, this presumption would not extend to the principle that, where a driver is forbidden to pick up hitch-hikers, but does have authority to pick up an extra driver or helper at his own expense, that one on the tractor-trailer without proof would be presumed to be an extra driver or helper.

It is true, as contended by the appellees, Gretsingers, that before a directed verdict may be granted, the Court must assume the truth of all the evidence tending to sustain the suit and all inferences of fact fairly deducible

therefrom, even though that evidence may be contradicted in every particular by opposing evidence. *Clough & Molloy v. Effie Shilling,* 149 Md. 189, 131 A. 343; *Henkelmann v. Metropolitan Life Insurance Co.,* 180 Md. 591, 26 A. 2d 418. The plaintiffs offered no evidence at all to prove that Gretsinger was on the truck as an extra driver or helper. The question then arises as to whether the jury could fairly infer, from the facts presented, that Gretsinger was an extra driver or helper at the time of the accident. It was shown, as above stated, that Schoblocher was driving a "slow load" and there was no hurry about his arrival at New York. The trip from Richmond to New York consumed between twelve and fourteen hours and Schoblocher was supposed to drive only eight hours at a time. He had driven about seven hours at the time of the accident. Gretsinger was in the United States Army, being treated for shock. It could be fairly deduced from the evidence that he was on his way to his home at Punxsutawney, Pa. It could hardly be fairly deduced from the evidence that Schoblocher picked up someone, not known to East Coast, as an extra driver of this heavily loaded truck. Nor could it be fairly deducted from the evidence that he picked up a shocked veteran, apparently unknown to him, for this heavy duty. It is also apparent that he needed no helper on the truck because the freight was not to be unloaded until he reached New York City. It is also hardly likely that Gretsinger would have gone as far as New York City on the truck, when his home was in Punxsutawney. We must therefore conclude that the jury could not fairly infer from the facts produced that Gretsinger was on the tractor-trailer as a helper or extra driver. Appellees cite the case of *Dashiell v. Moore,* 177 Md. 657, 11 A. 2d 640, where Moore was a guest passenger of Dashiell, who was operating an automobile which collided with a mule and another automobile. It was held in that case that, although Moore was a hitch-hiker, he was still entitled to the benefit of the common law rule that one whose fault causes injury to another who is himself free

from fault, is subject to liability to the person injured. In the case at bar this principle would apply to the liability of Schoblocher but not of East Coast.

In *Hall v. Poole,* 94 Md. 171, 50 A. 703, the defendants engaged a firm to repair the electric bell in their elevator. The electrical company sent plaintiff to do the work for the defendants. He investigated to ascertain where the trouble was located and told the elevator operator not to bring the elevator below the first floor as he was working underneath the elevator. While there working the elevator descended and injured him. This Court held in that case that the negligent acts of the elevator boy were not within the scope of his employment because the boy was employed to run the elevator from the cellar to the several floors of the building. If the plaintiff, without any notice to the defendants, assumed the risk of making an arrangement with the elevator boy in a way different from the manner in which he was employed to run it, the defendants should not be held liable. In *Mechem on Agency,* 2d Ed., Vol. 2, Section 1913, it is said at page 1488, section 1913, "As has already been seen, it is not ordinarily within the scope of a servant's authority to employ or obtain assistants to himself, neither is it usually within his implied authority to invite his friends or others to accompany him, visit him, or cooperate with him in or during the performance of his service, or to visit, enter upon or make use of his master's premises or property. For injuries to such third persons, therefore, which result merely from their being so associated with the servant, or from being permitted by him to be upon or in the master's premises or property, or which result from the servant's negligence to them while there, for which the master would not be liable if there had been no such invitation or permission, the master is not ordinarily responsible. So far as they became volunteer servants, also, the fellow-servant rule would ordinarily apply to them." See cases there cited.

The judgment of State of Maryland, to the Use of Maxine M. Gretsinger, Widow, *et al.,* against East Coast

Freight Lines, Incorporated, is reversed, with costs, and judgment entered for East Coast.

The judgment for the Mayor and City Council of Baltimore City in the suit against it by State of Maryland, to the Use of Maxine M. Gretsinger, Widow, *et al.*, is reversed, with costs, and a new trial is awarded in that case against the City alone.

> *Judgments appealed from, reversed with*
> *costs, and cases remanded for further*
> *proceedings as herein set forth.*